IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
(Eastern Division)

| | |
|---|---|
| CHARLES C. JOHNSON, et. al<br><br>Plaintiffs,<br>v.<br><br>GAWKER MEDIA, LLC, et. al,<br><br>Defendants. | :<br>:<br>: Case No. 14:15-cv-01137<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' SPECIAL MOTION TO STRIKE THE COMPLAINT PURSUANT TO THE CALIFORNIA ANTI-SLAPP LAW**

**INTRODUCTION**

The background of this lawsuit is summarized in Defendants' Motion to Dismiss, concurrently filed herewith. This motion raises the same arguments, but because, as discussed herein, California law applies to this lawsuit, it is submitted pursuant to California's anti-SLAPP statute, Cal. Civ. Proc. Code ("C.C.P.") § 425.16. This statute, which has been regularly applied by federal courts around the country in defamation cases arising under California law, may be invoked where, as here, a defendant faces meritless claims attacking its protected speech. Precisely in order to prevent litigants from inflicting damage through the litigation process itself, the statute provides for prompt dismissal with prejudice of claims such as these and requires recovery by defendants of their attorneys' fees and costs.

To survive a special motion pursuant to the statute, Plaintiffs bear the burden of demonstrating, with admissible evidence, that "there is a probability that [they] will prevail" on their claims. *Id.* If Plaintiffs fail to carry this burden, the Complaint must be stricken and Defendants awarded their attorneys' fees and costs. *Id.* For the reasons discussed in their Rule

1

12(b)(6) motion and addressed further herein, Plaintiffs cannot demonstrate a probability of success because their Complaint fails as a matter of law.  It must therefore be stricken, with fees and costs awarded to Defendants.

## STATEMENT OF FACTS

### I.     PLAINTIFFS' CONTROVERSIAL STYLE OF JOURNALISM

That Johnson is a well-known internet celebrity and public figure, and Got News is likewise well-known as the principal organ for publishing his views, is readily apparent by the materials incorporated by reference in the Complaint as set forth in Defendants' Motion to Dismiss.  We outline some additional materials in this motion solely to supplement that showing.[1]

Johnson's website illustrates that he has a history of publishing – or threatening to publish – personal information about individuals in stories he criticizes, or even those covering them, and he has attracted widespread notoriety and attention by doing so.  For example, Johnson accused a *New York Times* reporter of posing for *Playgirl*, which he had to retract because his source turned out to be an April-fools genre college satirical newspaper.  He contributed to a now widely-discredited story accusing Senator Robert Menendez of paying prostitutes in the Dominican Republic.  Taylor Wofford, *Did Cuban Agents Plant a Daily Caller Story Smearing Democratic Sen. Menendez?*, Newsweek (July 8, 2014), http://www.newsweek.com/cuban-intelligence-agents-daily-caller-smearing-senator-menendez-257896.  He published on his website the home addresses of *New York Times* and *Washington Post* journalists covering the protests of the shooting death of Michael Brown in Ferguson, Missouri, Charles C. Johnson, *Why*

---

[1] In deciding an anti-SLAPP motion, the Court may consider facts outside the four corners of the Complaint.  C.C.P. § 425.16(b)(2) ("[T]he court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.").  The additional articles referenced herein are included in the attached Declaration of Nathan E. Siegel.

*Can't We Publish Addresses of New York Times Reporters?*, Got News (Nov. 25, 2014), http://gotnews.com/cant-publish-addresses-new-york-times-reporters, and the wrong picture of "Jackie," the woman at the center of *Rolling Stone*'s alleged rape story at the University of Virginia, Terrence McCoy, *Meet the divisive blogger who says he outed Rolling Stone's Jackie*, Wash. Post. (Dec. 9, 2014), http://www.washingtonpost.com/news/morning-mix/wp/2014/12/09/the-blogger-who-wants-to-take-down-rolling-stone-jackie-and-the-university-of-virginia-president.  Johnson also repeatedly claimed on his now-deactivated Twitter account that President Obama was gay and offered money for photos of Senator Thad Cochran's wife in her nursing home bed.  *See* Jacob Silverman, *Is Charles Johnson a Digital Darth Vader?*, POLITICO (December 11, 2014), http://www.politico.com/magazine/story/2014/12/charles-johnson-a-digital-darth-vader-113522_full.html; Brett Logiurato, *Meet the 'Mega Troll' Who's Turned A Major US Senate Race Into His Own Performance Art Piece*, Business Insider (July 11, 2014), http://www.businessinsider.com/charles-johnson-mississippi-senate-race-mcdaniel-cochran-2014-7.

Plaintiffs' provocative journalism has in turn attracted an avalanche of criticism, both with respect to the quality of his reporting and his character, long before the first Gawker piece was published.  For example, in August 2014 *The Clarion Ledger* described Johnson as "a cowardly little man who makes hollow threats, baseless claims and wild accusations," and criticized him for a series of Tweets judging James Foley, the American journalist held captive for nearly two years and then beheaded by ISIS.  Sam Hall, *Charles Johnson reaches new low with James Foley Tweets*, The Clarion Ledger (Aug. 19, 2014), http://www.clarionledger.com/story/dailyledes/2014/08/19/charles-johnson-james-foley-tweets/14320165; *see also* Logiurato *supra* at 3 (opining in July 2014 that "Not many believe his claims or reporting in either story

3

due to his long list of prior controversies" and calling Johnson "a mega troll); David Weigel, *Daily Caller Cites 24-Year-Old Fake Princeton Newspaper to Attack the NYT's Benghazi Reporter*, Slate (Jan. 6, 2014) (debunking Johnson's Playgirl story in January 2014), http://www.slate.com/blogs/weigel/2014/01/06/daily_caller_cites_24_year_old_fake_ princeton_newspaper_to_attack_the_nyt.html; Rosie Gray & Ruby Cramer, *Reporter Who Questioned Cory Booker's Residency Also Worked For Anti-Booker PAC*, *Buzzfeed* (Dec. 17, 2013) (article from December 2013 questioning Johnson's undisclosed conflicts of interest in the Cory Booker story), http://www.buzzfeed.com/rosiegray/conservative-writer-who-questioned-cory-bookers-residency#.hoeRYnVyG5.

In October 2014 Johnson's Twitter account was suspended after he posted the street address of someone he said had been exposed to the Ebola patient in Dallas, Tom Kludt, *Charles C. Johnson's Twitter Account Suspended*, Talking Points Memo (Oct. 7, 2014), http://talkingpointsmemo.com/livewire/chuck-c-johnson-twitter-suspended, and it has since been permanently suspended.  Johnson has actively solicited public support on his website to petition Twitter to reactive his account.  *See generally* Got News, http://gotnews.com.

And before the Gawker articles, the *New York Daily News*, *International Business Times* published pieces regarding Johnson publishing the personal information of "Jackie," which promoted yet another social media controversy concerning Plaintiffs, to which Defendants and many other media responded.  Alejandro Alba, *GotNews reporter is blasted on social media for revealing name of alleged UVA rape victim,* N.Y. Daily News (Dec. 8, 2014), http://www.nydailynews.com/news/national/reporter-criticized-revealing-uva-rape-victim-article-1.2037087; Christopher Zera, *Twitter Harassment? Charles C. Johnson Boasts of Doxing 'Jackie,' Alleged UVA Rape Victim*, International Business Times (Dec. 8, 2014),

4

http://www.ibtimes.com/twitter-harassment-charles-c-johnson-boasts-doxing-jackie-alleged-uva-rape-victim-1743596.  For example, the day before Trotter posted his first article, *Wonkette* profiled Johnson and described him as the "human equivalent of toxic sludge."  Gary Legum, *Twitter's Biggest Scumbag Chuck C. Johnson Outs Rape Victim to Teach Feminists a Lesson*, Wonkette (Dec. 8, 2014), http://wonkette.com/568535/twitters-biggest-scumbag-chuck-c-johnson-outs-rape-victim-to-teach-feminazis-a-lesson.  *The Washington Post* also published on December 9 a critical profile of Johnson at the same time that Trotter's first column was posted.  *See* McCoy *supra* at 3.  So did *US News*, which described Johnson as "a bully and a troll."  Susan Milligan, *A Bully and a Troll*, U.S. News (Dec. 9, 2014), http://www.usnews.com/opinion/blogs/susan-milligan/2014/12/09/charles-c-johnsons-cruel-trolling-of-uva-rape-survivor-jackie.  *POLITICO* then described Got News as characterized by "its scorched-earth mentality and exploitation of subjects' personal lives," and stated that Johnson might be "the most hated man on the Internet."  *See* Silverman *supra* at 3.  The *New York Times* likewise published a lengthy profile of Plaintiffs, which was referenced in the second Trotter article.

## II.      PLAINTIFFS' MISUSE OF LIBEL LAW TO SILENCE THEIR CRITICS

While Plaintiffs' livelihood depends on the robust protection that the First Amendment provides to express vituperative opinions about the targets of their commentary, Johnson is far less inclined to respect freedom of speech when critical opinions or rhetorical insults are directed at him.  Thus, Johnson has repeatedly and publicly threatened to sue his critics for defamation, be they *Gawker*, *Buzzfeed*, *ABC News*, or many others.  The conservative newspaper *Daily Caller*, to which Johnson formerly contributed, satirically characterized his repeated threats as a planned "libel lawsuit jihad on the media."  Betsy Rothstein, *Charles Johnson Plans Libel Lawsuit Jihad On Media*, Daily Caller (Dec. 11, 2011), http://dailycaller.com/2014/12/11/

5

charles-johnson-plans-libel-lawsuits-jihad-on-media.  Another critic opined that "[a] self-proclaimed journalist should know better" than to threaten libel lawsuits against other journalists. Adam Steinbaugh, *The Unrealized Defamation Threats of Charles C. Johnson*, Adam Steinbaugh's Blog about Law and Tech. (Dec. 10, 2014), http://adamsteinbaugh.com/2014/12/10/the-unrealized-defamation-threats-of-charles-c-johnson.  Notably, Johnson has publicly identified a Los Angeles attorney as his libel counsel with whom he consults about potential lawsuits, *see* Rothstein, *supra* at 5-6, but now brings this lawsuit in Missouri.

## ARGUMENT

### I.     CALIFORNIA LAW GOVERNS THIS ACTION

In diversity cases, a district court applies the choice-of-law rules of its forum state. *Allianz Ins. Co. of Can. v. Sanftleben*, 454 F.3d 853, 855 (8th Cir. 2006).  In tort cases, Missouri applies the law of the state with the "most significant relationship to the occurrence and the parties." *Thompson v. Crawford*, 833 S.W. 2d 868, 870 (Mo. 1992).  Missouri has adopted Section 145 of the Restatement (Second) of Conflict of Laws which states that the following factors should be considered in determining the most significant relationship:  "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." *Birnstill v. Home Sav. of Am.*, 907 F.2d 795, 797 (8th Cir. 1990).

In *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618 (8th Cir. 2004), the Eighth Circuit addressed the precise issue presented in this case:  which state's law Missouri would apply in the context of defamation on the internet.  *Fuqua* explained that the Missouri Supreme Court has approved Section 150 of the Restatement (Second) of Conflicts of Laws, which "creates a

6

presumption that when a corporation brings a defamation suit arising from an aggregate communication, the state with the most significant relationship will be the state of the corporation's principal place of business." 388 F.3d at 622 (citing *Elmore v. Owens-Ill., Inc.*, 673 S.W.2d 434, 436-37 (Mo. 1984)).  With respect to an individual, both the Restatement and *Elmore* likewise provide that the "state of most significant relationship will usually be the state where the person was domiciled at the time." *Restatement (Second) of Conflict of Laws* § 150(3); *see also Fuqua*, 388 F.3d at 622 ("[T]he most important consideration in choosing the applicable law is the residence of the party allegedly defamed." (citing *Elmore*, 673 S.W.2d 434 at 436-47)).  This is because "defamation produces a special kind of injury that has its principal effect among one's friends, acquaintances, neighbors and business associates in the place of one's residence." *Fuqua*, 388 F.3d at 622 (citation and marks omitted).

*Fuqua* likewise held that "the publication of defamatory material via the internet is closely analogous to the methods of aggregate communication listed in § 150," and therefore "Missouri would adhere to the presumption created in § 150 in cases where defamatory material is published on an internet website." *Id.*  Indeed, numerous courts applying the Restatement to allegedly defamatory publications have held that the law of the plaintiff's domicile governs. *See, e.g., Aoki v. Benihana, Inc.*, 839 F. Supp. 2d 759, 765 (D. Del. 2012) (following *Fuqua* to apply New York law to claim of defamation over the internet because plaintiffs resided there); *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 699-700 (D. Md. 2011) (applying New York law to internet publications); *Natural Wealth Real Estate, Inc. v. Cohen*, 2006 WL 3500624, at *4 (D. Colo. Dec. 4, 2006) (where tortious interference with prospective business advantage claim was premised on allegedly false multistate communications, "Colorado – the state of . . . the corporate-plaintiffs' principal place of business – has the most significant

relationship to the alleged wrongdoing"); *accord Sys. Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1138-39 (3d Cir. 1977) (applying New Jersey law as location of plaintiff's principal place of business to multistate communications).[2]

In this action, California is clearly the presumptive choice of law and the facts here present no conceivable basis to depart from that strong presumption. The principal locus of Plaintiffs' alleged reputational and emotional injuries is California, where Johnson resides and attended college, and the sole locus of Got News's alleged "lost business and lost investments" is California since that is the only state in which it operates. By contrast, Missouri has no meaningful relationship to this case at all, and it would appear likely that the principal reason Plaintiffs have filed this lawsuit in Missouri rather than use their California libel attorney is because they hope to evade their state's anti-SLAPP law. That demonstrates all the more why California has the strongest interest in having its law applied here, so that its anti-SLAPP statute cannot be evaded by enabling Plaintiffs to forum shop their SLAPP lawsuits to other states.

## II.    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED UNDER THE CALIFORNIA ANTI-SLAPP STATUTE

### A.    The California Anti-SLAPP Statute

"SLAPP" is an acronym for "strategic lawsuits against public participation," a term of art for lawsuits much like this one that are intended to silence a plaintiff's critics. In enacting the anti-SLAPP statute, the California Legislature declared that "it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." C.C.P. § 425.16(a). The statute provides a mechanism "to dismiss meritless lawsuits designed to chill the defendant's free

---

[2] Section 151 of the Restatement further provides that the choice of law rules for injurious falsehood and defamation are the same, while Section 153 provides that the presumptive law governing invasion of privacy claims is likewise the state where the plaintiff is domiciled. *Restatement (Second) of Conflict of Laws* §§ 151, 153.

8

speech rights at the earliest stage of the case," *Kunysz v. Sandler*, 146 Cal. App. 4th 1540, 1543 (2007), and is "designed to nip SLAPP litigation in the bud," *Braun v. Chronicle Publ'g Co.*, 52 Cal. App. 4th 1036, 1042 (1997).  If an anti-SLAPP motion is successful, the case is dismissed with prejudice and the defendant awarded its attorney's fees and costs.  *See* C.C.P. § 425.16(c)(1).

Because California's anti-SLAPP statute confers a substantive immunity under California law, it applies in federal court.  *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970-73 (9th Cir. 1999).  As a result, many federal courts outside California have applied its anti-SLAPP statute to dismiss defamation suits that are governed by California law.  *See, e.g.*, *Tobinick v. Novella*, 2015 WL 3540053 (S.D. Fla. June 4, 2015) (granting anti-SLAPP motion in defamation case brought by California resident against internet blogs); *Gilead Sciences, Inc. v. Abbot Labs., Inc.*, 2015 WL 1191129 (D. Del. March 13, 2015) (granting anti-SLAPP motion to strike defamation claims by a California company); *Adelson v. Harris*, 973 F. Supp. 2d 467 (S.D.N.Y. 2013) (granting anti-SLAPP motion under similar Nevada law), *cert. granted*, 774 F.3d 803 (2d Cir. 2014); *USANA Health Sciences, Inc. v. Minkow*, 2008 WL 619287 (D. Utah Mar. 4, 2008) (granting anti-SLAPP motion under California law); *see also Price v. Stossel*, 2008 WL 2434137 (S.D.N.Y. June 4, 2008) (finding California anti-SLAPP statute would be applied by a New York federal court).

The determination as to whether an anti-SLAPP motion should be granted is a two-part inquiry.  *First*, the defendant must make a *prima facie* showing that its activities challenged in the lawsuit arise from a category of protected speech that is protected by the statute.  *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 953 (9th Cir. 2013); *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003).  *Second*, if the defendant makes that showing, the burden shifts to the plaintiff to

9

demonstrate a probability of prevailing on the merits.  *Id.*; *Equilon Enters. v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 67 (2002).

        **B.**      **Plaintiffs' Claims Trigger the Anti-SLAPP Statute because They Arise from Defendants' Acts in Furtherance of Their Free Speech Rights**

As an initial matter, it is notable that the California anti-SLAPP statute was designed to ensure protection from individuals just like Plaintiffs:  those who regularly threaten or bring defamation litigation in an effort to punish and silence their critics, rather than recover fair compensation for anything the law actually recognizes as a genuine injury.  *See* C.C.P. § 425.16(a).  In any event, Defendants plainly meet the statutory requirements of the Act that trigger its application.  The Gawker articles are "written or oral statement or writing[s] made in a place open to the public or a public forum in connection with an issue of public interest."  *Id.* § 425.16(e)(3).  "Web sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute."  *Barrett v. Rosenthal*, 40 Cal. 4th 33, 41 n.4 (2006); *see also Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1039 (2008).

Moreover, the controversy over Plaintiffs is clearly "an issue of public interest."  The anti-SLAPP statute by its own terms must be construed broadly, *see* C.C.P. § 425.16(a), and as a result California courts have broadly construed public interest to include "any issue in which the public is interested," *Nygard, Inc.*, 159 Cal. App. 4th at 1042-43 (holding that articles about "celebrity gossip" are protected by the anti-SLAPP statute); *see also Hall v. Time Warner, Inc.*, 153 Cal. App. 4th 1337 (2007) (*Celebrity Justice* program about Marlon Brando's housekeeper's share of his will); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798 (2002) ("tabloid" radio show mocking a contestant on *Who Wants to Marry A Multimillionaire*); *Sipple v. Found. for Nat'l Progress*, 71 Cal. App. 4th 226 (1999) (*Mother Jones* article on nationally known political consultant's divorce dispute involved an issue of public interest).  The record here makes clear

10

that Plaintiffs' reporting and character were hotly-debated "issue[s] of public interest" nationwide.

### C. Plaintiffs Cannot Carry Their Burden of Demonstrating a Probability of Success on the Merits

Since Defendants' articles qualify for the anti-SLAPP statute's protection, the burden shifts to Plaintiffs to establish a probability that they will prevail on the merits. C.C.P. § 425.16(b)(1). To make such a showing, they must adduce "admissible evidence" demonstrating that they "probably" will prevail on their claims. *Beilenson v. Super. Ct.*, 44 Cal. App. 4th 944, 952-53 (1996). If Plaintiffs cannot satisfy this burden, the Court *must* dismiss the complaint. C.C.P. § 425.16(b)(1). Where a complaint fails to state a claim as a matter of law, it must be dismissed pursuant to the anti-SLAPP statute. *See Choose Energy, Inc. v. American Petroleum Institute*, --- F. Supp. 3d ---, 2015 WL 1737992, at *5 (N.D. Cal. Apr. 8, 2015).

As discussed in greater detail in Defendants' concurrently filed Memorandum in support of Defendants' Motion to Dismiss, the Complaint fails to state a claim for defamation, injurious falsehood or false light multiple reasons:

1. Plaintiffs are public figures who have failed to plead facts that could support a finding of actual malice against Defendants. *See* MTD at 10-11. Moreover, the facts and related materials pled negate any plausible claim of malice. Defendants' critiques are similar to numerous other media articles. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 56-58 (1st Cir. 2012) (affirming dismissal where challenged statements "synced up with or at least [were] not out of line with" prior news reports). Defendants' articles link to their source material so that readers can judge for themselves; they extensively include Johnson's denials and point of view; and they humorously question the two rumors the Complaint alleges are false. *See Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 622 (2d Cir. 1988) (finding no

11

actual malice and noting "the article does present [the plaintiffs'] position with respect to the various controversies"); *Price v. Viking Penguin, Inc.*, 676 F. Supp. 1501, 1512-13 (D. Minn. 1988), *aff'd*, 881 F.2d 1426 (8th Cir. 1989) (reporting rumors as rumors is not actual malice); *Freedom Newspapers of Texas v. Cantu*, 168 S.W.3d 847, 858 (Tex. 2005) (reporting multiple sides of a story demonstrates the absence of actual malice).

2.  The statements critiquing the accuracy of Plaintiffs' reporting are constitutionally protected opinions that are supportable interpretations of Plaintiffs' work based on disclosed source material. *See* MTD at 11-12. California law likewise evaluates the "totality of the circumstances" to determine whether statements are protected opinion, including both the language of the statements at issue and their context, such as "'the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed.'" *Seelig*, 97 Cal. App. 4th at 809-10. Here the statements are presented as conclusions based on disclosed sources, and they were published within the context of the blogosphere, in which readers understand they are likely to encounter the exchange of vituperative, highly-charged opinions. *See, e.g.*, *Farah v. Esquire Magazine*, 736 F.3d 528, 539 (D.C. Cir. 2013) ("Because the reasonable reader could not, in context, understand *Esquire*'s blog post to be conveying 'real news' – that is, actual facts about Farah and Corsi – the blog post was not actionable defamation."); *Art of Living Found. v. Does*, 2011 WL 2441898, at *7 (N.D. Cal. June 15, 2011) ("In the broad context, the statements are made on obviously critical blogs . . . with heated discussion and criticism . . . .  In this context, readers are less likely to view statements as assertions of fact rather than opinion."); *Accuardi v. Fredericks*, 2014 WL 848263, at *6 (D. Or. Mar. 4, 2014) ("[T]he tenor of Fredericks's Blog communicates that its content is offered as opinion.").

12

3. The statements by Trotter and Howard about rumors that Johnson defecated on a floor and committed bestiality as a minor are not reasonably capable of a defamatory meaning, and are protected by the First Amendment, for either of two reasons. *See* MTD at 12-13. *First*, the tenor of the articles as a whole make clear that they are tongue-in-cheek efforts to poke fun at Johnson's expense and do not purport to assert these rumors as fact. It is well-established that attempts at satirical humor, whether deemed to be in good taste or not, are not actionable defamation. *See, e.g.*, *Knievel v. ESPN, Inc.*, 393 F.3d 1068, 1074-75 (9th Cir. 2005) (photo caption stating "Evel Knievel proves you are never too old to be a pimp" is not actionable); *Pring v. Penthouse Int'l, Ltd.*, 695 F.2d 438, 440-43 (10th Cir. 1982) (article portraying Miss America contestant performing oral sex during the contest not meant to be taken literally); *Dworkin v. Hustler Magazine, Inc.*, 668 F. Supp. 1408, 1417-18  (C.D. Cal. 1987) (pictures/captions referring to plaintiff performing oral sex not actionable), *aff'd*, 867 F.2d 1188 (9th Cir. 1989); *Geary v. Goldstein*, 1996 WL 447776, at *3 (S.D.N.Y. Aug. 8, 1996) (use of plaintiff's picture in sexual parody did not imply she was a pornographer); *Polygram Records, Inc. v. Super. Ct.*, 170 Cal. App. 3d 543, 554-56 (1985) ("discernibly humorous intent" of publisher and "comedic context" of whole publication negated alleged defamatory meaning); *Hoppe v. Hearst Corp.*, 770 P.2d 203, 206-07 (Wash. Ct. App. 1989) (satirical column referring to plaintiff as "Hurley Herpes").

*Second*, even if the Howard and second Trotter articles could be construed literally, they merely raise the question whether the rumors about Plaintiff are true. Both the headlines and the articles themselves are expressly framed as questions. Siegel Decl., Ex. 22 (*Which of These Disgusting Chuck Johnson Rumors Are True?*) ("So maybe you're wondering: Which of those rumors are real?"); *id.*, Ex. 17 (*Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor*

13

*One Time?*) ("And so I ask you, dearest readers:  Did Chuck Johnson really shit on the floor in college?").  It is well-settled that questions are likewise not actionable defamation.  *See* MTD at 14.  Moreover, to the extent the articles could be construed to provide any serious response to that question, they conclude there is no evidence to support the rumors and their existence is likely attributable to the fact that Johnson is intensely disliked by some people.  Thus, because the articles do not assert any actual facts about Plaintiffs, they are not actionable.

   4. The statements made by third-party readers to Gawker's websites are barred by Section 230 of the Communications Decency Act ("CDA"), 47 U.S.C. §230.  *See* MTD at 14-15.

   5. The causes of action for false light invasion of privacy and injurious falsehood are subject to the same standards as, and therefore fail for the same reasons as the defamation claims.  *Blatty v. New York Times Co.*, 232 Cal. Rptr. 542, 547 (1986) ("Although the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement."); *Cobb v. Paxton*, 45 Cal. App. 4th 829, 845 (1996) (state law and constitutional standards for defamation apply to false light claims premised on the same facts).

## **CONCLUSION**

   This case is exactly the type of lawsuit for which the California Anti-SLAPP Act was enacted.  Accordingly, Plaintiffs' Complaint should be dismissed with prejudice.

Dated:  August 24, 2015	Respectfully submitted,

                                       **LEWIS, RICE & FINGERSH, L.C.**

                                       By:    /s/ Joseph E. Martineau
                                          Joseph E. Martineau, #32397
                                            600 Washington, Suite 2500
                                            St. Louis, Missouri  63101
                                            jmartineau@lewisrice.com
                                            314/444-7729
                                            314/612-7729 (facsimile)

                                            Nathan Siegel*
                                            LEVINE SULLIVAN KOCH & SCHULZ, LLP
                                            1899 L St., NW, Suite 200
                                            Washington, DC 20036
                                            Tel:  (202) 508-1100
                                            Fax:  (202) 861-9888
                                            nsiegel@lskslaw.com
                                            *pro hac vice*

                                       *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 24th day of August, 2015, a true copy hereof was served with the Clerk of the Court using the CM/ECF system on the following:

Jonathon Christian Burns
THE BURNS LAW FIRM, LLC
1717 Park Avenue
St. Louis, MO 63104
john@burns-firm.com

*Attorneys for Plaintiffs*

By:   /s/ Joseph E. Martineau