IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
(EASTERN DIVISION)

| | | |
|---|---|---|
| CHARLES JOHNSON and | : | |
| GOT NEWS, LLC | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 4:15-cv-001137 |
| v. | : | |
| | : | |
| GAWKER MEDIA, LLC, J.K. TROTTER, | : | **DEMAND FOR JURY TRIAL** |
| and GREG HOWARD | : | |
| | : | |
| Defendants. | : | |

## FIRST AMENDED COMPLAINT FOR DEFAMATION, INJURIOUS FALSEHOOD, AND INVASION OF PRIVACY (FALSE LIGHT)

COMES NOW Plaintiffs Charles C. Johnson and Got News LLC, by and through his undersigned counsel, and for his First Amended Complaint against Defendants Gawker Media LLC, ("Gawker")  J.K. Trotter ("Trotter") and Greg Howard ("Howard") (collectively, "Defendants"), states as follows:

## JURISDICTION AND VENUE

Because Plaintiffs have been injured in the State of Missouri, the matter is properly before a circuit court of Missouri. Venue is determined solely by statute. *State ex rel. Selimanovic v. Dierker*, 246 S.W.3d 931, 932 (Mo. banc 2008). Because the matter alleges torts, including defamation and invasion of privacy, venue is proper in this Court. V.A.M.S. § 508.010.8

## FACTUAL ALLEGATIONS

1.      Plaintiff Charles C. Johnson is a journalist and the president and owner of Got News, LLC, a media company which owns Gotnews.com, a news and commentary website.

2.      Plaintiff Charles C. Johnson has never before initiated a lawsuit for defamation.

3.      Defendant Gawker Media LLC, is a corporation organized and existing under the laws of the state of Delaware with its primary place of business located in New York, New York.

4.      Defendant J.K. Trotter, upon information and belief, is a resident of the state of New York.

5.      Defendant Greg Howard, upon information and belief, is a resident of the state of New York.

6.      At all times relevant to this Complaint, Defendants Trotter and Howard were employed as journalists by Defendant Gawker.

7.      As a threshold matter, Plaintiff hereby incorporates herein by reference, Exhibits 1-41 as if fully stated herein. An index of exhibits is included after the signature block of this Complaint.

8.      As a threshold matter, unless specifically stated otherwise, all factual allegations are upon information and belief.

9.      Defendant Gawker owns a family of tightly-linked, internet-based media properties, with sub-brands that are each, individually and collectively marketed by Gawker.

10.     Among the media properties owned and marketed by Gawker are Deadspin.com and Gawker's flagship site, Gawker.com.

11.     Upon information and belief, the Gawker online media properties have in excess of sixty-four million (64,000,000) unique monthly readers in the United States.[1]

12.     Gawker had approximately 540,000 twitter followers in December of 2014.

13.     Per Quantcast, Gawker Media has over **One Million** unique Missouri readers.

---

[1] http://advertising.gawker.com/about/ last accessed June 17, 2015.

14.     Gawker's media properties, such as the properties mentioned above, contain a variety of content. For example, Deadspin.com is primarily a sports news and sports commentary website. The remaining properties may have different topical focuses, but each carries content primarily consisting of news and commentary.

15.     Gawker earns revenue, among other ways, by selling advertising on its media properties.

16.     Gawker has over a million readers in Missouri, as evidenced Quantcast data showing Gawker.com's web traffic.

17.     Gawker properties have endlessly written about the Ferguson riots and related topics,[2] including publishing articles highly critical of Plaintiffs' efforts in investigative journalism regarding various "Ferguson" topics.[3]

18.     Further, Deadspin.com, a Gawker media property dedicated to sports, famously, viciously, repeatedly, and continuously, attacked the St. Louis Cardinals recently.[4]

19.     Tracking technology currently exists which allows advertisers on media websites to track readers' age, gender, **location**, and many other data points.[5]

---

[2] See, James West, "*Gawker Took Only One Day to Report and Vet the Story That Blew Up in Its Face*," published by Mother Jones on July 24, 2015. http://www.motherjones.com/media/2015/07/gawker-conde-nast-fallout-timeline-denton.

[3] See, e.g., A.J. Daulerio, "The Story Behind the Stories You Loved This Year: Hulk Hogan's Mesmorizing Sex Tape," published by gawker.com on December 26, 2012. http://gawker.com/5971314/the-story-behind-the-stories-you-loved-this-year-hulk-hogans-mesmerizing-sex-tape.

[4] Drew Magary, "*Eat Shit, Cardinals*" June 16, 2015 (http://deadspin.com/eat-shit-cardinals-1711726377 last accessed October 4, 2015); Drew Magary, "*Why Your Cardinals Suck*," October 10, 2013 (http://deadspin.com/why-your-cardinals-suck-1443513646 last accessed October 4, 2015) (emphasis added); Tom Ley, "*Everyone Involved In The Cardinals Hacking Scandal Seems To Be An Idiot*," (http://deadspin.com/everyone-involved-in-the-cardinals-hacking-scandal-seem-1711682201 last accessed October 4, 2015); Samer Kalaf, "*Report: FBI Investigates the St. Louis Cardinals For Hacking the Astros*," June 16, 2015 (http://deadspin.com/report-fbi-investigates-st-louis-cardinals-for-hackin-1711673515, last accessed October 4, 2015); Drew Magary, "*Moron USA Today Columnist Thinks The Cardinals Poop Vanilla Sprinkle*," March 5, 2015 (http://deadspin.com/moron-usa-today-columnist-thinks-the-cardinals-poop-van-1689616561, last accessed October 4, 2015).

20.     After working for a time as a reporter for the Financial Times, Nick Denton founded Gawker in 2003.

21.     Denton's goal was to change journalism by turning *ordinary people* into content creators:[6]

> Similarly, Denton admits that the journalistic standards of his blogs are lower than those in traditional media. But, he says, that's the whole point of the venture. "We go after sacred cows. We run stories on the basis of one anonymous source, in many cases, and a bit of judgment. We put it out there. We make clear the level of confidence we have in a story. We ask for help [from site visitors], we ask for corroboration, we ask for denials. Every single story is a work in progress, it's not meant to be final. It's like a reporter's notebook."

22.     Concurrent with starting Gawker, Denton also began a pornography blog (also featuring hardcore porn) called "Fleshbot" which is part of the Gawker empire.

23.     Denton's first big hits were as a result of publishing private sex tapes of public figures. For example, the infamous Paris Hilton sex tape.[7]

24.     Denton told The Hollywood Reporter in 2013 in an article entitled, "*Gawker's Nick Denton Explains Why Invasion of Privacy Is Positive for Society*":[8]

---

[5]For example, see Plaintiffs' Ex. 41, which is a screenshot taken by Plaintiffs' counsel when he visited gawker.com's home page (www.gawker.com) on Sunday, October 4, 2015. Note that there is an ad on the page marketing "**Budweiser Brewery Experience SAINT LOUIS - This Tour's For You - BudweiserTours.com**" This ad clearly is marketing to Plaintiffs' counsel because the gawker.com technology gurus have tracking tech which knows that Plaintiffs' counsel is a reader, **viewing the site from St. Louis, Missouri**.

[6] Excerpt from, Jay Rayner, "*The Brit Dishing The Dirt On America*," The Guardian, Sunday 9 March 2008. http://www.theguardian.com/technology/2008/mar/09/gawker (last accessed Oct. 9. 2015).

[7] Excerpt from, Jay Rayner, "*The Brit Dishing The Dirt On America*," The Guardian, Sunday 9 March 2008. http://www.theguardian.com/technology/2008/mar/09/gawker (last accessed Oct. 9. 2015).

[8] May 22, 2013, by Eriq Gardner (http://www.hollywoodreporter.com/thr-esq/gawkers-nick-denton-explains-why-526548 last accessed October 8, 2015).

4

**THR: When you started Gawker, did you have an idea that you were going to change things?**

**Denton:** Yeah. The basic concept was two journalists in a bar telling each other a story that's much more interesting than whatever hits the papers the next day.

**THR: Do you think journalists censor themselves?**

**Denton:** Well, I used to think it had to do with legal reasons and people being too fearful of libel. But actually, now I think the larger factor is a journalist's desire for respectability -- not wanting to expose themselves, not wanting to say, "Hey we've heard this, we're not completely sure whether it's true." People are talking about this. We're just going to share with you as we would share with our colleagues what we have.

**THR: What have you learned along the way?**

**Denton:** We've removed a lot of obstacles to free journalism and yet --

**Cook:** There is still the desire to be right. That is still important to me and to everyone we work with. We want to get it right. Our standards for getting it right are different from larger, more established institutions, and we do not just throw out every tip that we get on the site. We evaluate and report.

**Denton:** That is a disagreement between us. That's a disagreement between me and a lot of our journalists is that I would like more of the tips to be published. Maybe not published under John's name but published under a tipster's name or under a tipster's anonymous handle. I would like them to be published.

25.   The excerpt demonstrates the operating principle of Gawker: publish sensational rumors - regardless of whether or not Gawker has any possible way of establishing the truth or falsity of the claim.

26.   Denton has admitted that his site has lower journalistic standards than "traditional media."

27.   Nick Denton has made clear that Gawker relies upon readers of his site to provide content for his site - in other words, that his readers are collaborators on articles:[9]

---

[9] James Silver, "*Gawk, Don't Talk - Interview With Nick Denton*," The Guardian, Monday 11 December 2006 (http://www.theguardian.com/technology/2006/dec/11/news.mondaymediasection last accessed October 9, 2015).

The future, Nick says, lies with what he calls iterative reporting, in which posts are used to request information and to help stand up stories. 'As a print journalist, if you hear a rumour you try to stand it up and if you can't the story dies,' he says. 'With a blog you can throw the rumour out there and ask for help. You can say: "We don't know if this is true or not."' What about libel? 'We just have to make sure we're not doing it maliciously and that we also admit when we're wrong. Personally, as a print journalist, I always found the most interesting stories to be the ones hacks talked about in the bar after work. Those are the ones we deal in.' He goes further, talking about how he wants his readers to be the source of stories, how they'll split page-view bonuses with them if the story runs. 'I want to institutionalise and automate chequebook journalism.'

28.      In 2006, Gawker initiated a feature on the site called "Gawker Stalker,"[10] which allowed the readership of the website to "crowdsource"[11] the geographic locations of celebrities in "real-time."[12]

29.      The feature tied-into Google Maps and allowed users to pinpoint the locations, much to the terror of celebrities. Despite obvious concerns for the safety of individual public figures.[13]

30.      Denton was extremely pleased with the scandal surrounding the new feature, because it made Gawker a great deal of money.[14]

31.      Specifically, Denton was pleased because subsequent to the creation of Gawker Stalker, celebrities such as George Clooney publicly attacked the feature because they feared being stalked, generating free publicity, clicks, and traffic for Gawker.

---

[10] See John Cook, entitled "A Judge Told Us to Take Down Our Hulk Hogan Sex Tape Post. We Won't." published by gawker.com on April 25, 2013, available online at http://gawker.com/a-judge-told-us-to-take-down-our-hulk-hogan-sex-tape-po-481328088 and Jessica, entitled "Introducing Gawker Stalker," published by gawker.com on March 14, 2006, available at http://gawker.com/160338/introducing-gawker-stalker-maps.

[11] "Crowdsourcing" has been defined by Merriam-Webster as: "The practice of obtaining needed services, ideas, or content by soliciting contributions from a large group of people and especially from the online community rather than from traditional employees or suppliers." (http://www.merriam-webster.com/dictionary/crowdsourcing last accessed Oct. 9, 2015).

[12] "Real Time" has been defined by Merriam-Webster as, "The actual time during which something takes place." (http://www.merriam-webster.com/dictionary/real%20time last accessed Oct. 9, 2015).

[13] Celebrities are already at high risk without Gawker creating a de facto GPS tracking device. By way of example, John Lennon, born October 9, 1940, was shot and killed by a deranged fan. https://en.wikipedia.org/wiki/Death_of_John_Lennon (last accessed October 9, 2015).

[14] James Silver, "*Gawk, Don't Talk - Interview With Nick Denton*," The Guardian, Monday 11 December 2006 (http://www.theguardian.com/technology/2006/dec/11/news.mondaymediasection last accessed October 9, 2015).

6

32.     Kinja is a news content aggregator across Gawker sites.[15]

33.     It allows Readers as well as paid Gawker Staff to create user profiles, chat real time, comment on news articles, and create unique blogs - which can sometimes become so popular by other users that Gawker will co-opt the blog and bring it into the Gawker family.

34.     In essence, Kinja removes virtually all distinctions between paid staff content and unpaid staff content. And this is by design, because it is part of Nick Denton's vision:[16]

> Messaging applications are the standard for personal communication: swift, stripped down and lively. Kinja is an effort to apply the same qualities to public sites whether from Gawker writers, partner publishers or solo bloggers. It is a *collaborative journalism platform* with the following feature at its heart, what we call the *group chat*.
>
> Each group chat has an instigator, typically but not necessarily the blog owner or one of their authors. The instigator can launch a topic with a news or opinion piece with a headline; or just with a question to another user.
>
> Even a long and exhaustive article should be just a starting point. Sites on the latest Kinja template display subsequent discussion with the same graphical treatment and respect as the author's starter post. The exchange should read like a question-and-answer session, the classic web chat format. We believe this conversational format will encourage the story to develop and the truth to be tested.

35.     As the above excerpt demonstrates, Kinja is the realization of Denton's dream of removing the barrier between "author" and reader.

36.     Gawker believes that the news will, long term, become entirely **dependent** upon crowdsourcing:[17]

---

[15] https://en.wikipedia.org/wiki/Kinja (last accessed Oct. 9, 2015).

[16] Excerpt from Nick Denton, "*Introducing Group Chats In Kinja*," http://product.kinja.com/introducing-group-chats-in-kinja-1517330082. February 6, 2014. Last accessed Oct. 8, 2015.

### (1) Crowd-sourcing / collaboration / socialization of everything

As with many other sectors, the news will become increasingly depending on gathering information from every person possible, especially those who have firsthand accounts of an event or those who are experts in the topic being discussion. How can we highlight and maximize this in our system?

37.    **Paid or unpaid by Gawker**, all content creators are statistically ranked by how much traffic they bring to Gawker's sites.[18]

38.    J.K. Trotter and Greg Howard, paid content creators for Gawker/Kinja as well as Defendants in this case, are ranked at 97th and unranked, respectively.[19]

39.    "Collin Krum," on the other hand, is an unpaid content creator, as is Kevin Purdy, who are ranked 117 and 115 respectively.[20]

40.    Collaboration between paid and unpaid content creators is central to Gawker's media strategy, and crucial from both a content creation standpoint as well as a marketing standpoint.

41.    "Gawker executives introduced a "Kinja bonus," modeled after the unique bonus,[21] in an effort to boost writers' engagement with the comments."[22]

42.    To circumvent liability for anonymous tipsters, Gawker has not only created **tutorials** for unpaid content creator collaborators to leak information without fear of defamation suit repercussions (see *infra*), but Gawker **has actually designed, as part of its Kinja platform,**

---

[17] Maggie Rose, "*World Future Part 4: The Future of Kinja,*" Aug. 5, 2015 http://maggierosetao.kinja.com/world-future-2015-part-4-the-future-of-kinja-1726375719 (last accessed Oct. 9, 2015).

[18] See http://gawker.com/stats/leaderboard (last accessed Oct. 10, 2015).

[19] *Id.*

[20] *Id.*

[21] Paid writers get a bonus for the number of unique visitors they bring to Gawker sites.

[22] See Caitlin Petre, "The Traffic Factories: Metrics at Chartbeat, Gawker Media, and The New York Times," published by Tow Center for Digital Journalism on May 7, 2015, available at http://towcenter.org/research/traffic-factories/.

**specific tools to avoid liability for defamation actions** - burner accounts and Gawker SecureDrop.

43.     A "burner account" is an anonymous Kinja user profile wherein Gawker does not store any personally identifying information about the user.

44.     In "How to Leak to Gawker Anonymously,"[23] a Gawker "how to" article written by Defendant J.K. Trotter, Trotter describes a variety of alternatives for the would-be tipster to circumvent liability for defamation.

45.     In it, Trotter  instructs tipsters to use Gawker's "SecureDrop," and he hyperlinks to a Gawker site which carries a "how-to" article specific to using "SecureDrop."[24]

46.     In the case before this Court, the anonymous unpaid content creator collaborator commenters at issue used "burner accounts," to protect their anonymity.

47.     Gawker "SecureDrop" is carefully and deliberately devised means for anonymous tipsters to totally circumvent defamation liability. ("maximizing your anonymity and frustrating any attempts (including by [Gawker]) to identify [the Tipster] as the source").

48.     In July of 2015, Gawker published an article alleging that a Conde Nast executive[25] - David Geithner, brother of former Treasury Secretary Timothy Geithner - had solicited sex from a homosexual escort.

49.     David Geithner is publicly heterosexual, married, and the father of three young children.[26]

---

[23] J.K. Trotter, "*How to Leak to Gawker Anonymously*," August 8, 2014. http://gawker.com/how-to-leak-to-gawker-anonymously-1613394137 (last accessed Oct. 9, 2015).
[24] "Welcome to the Gawker Media SecureDrop." Undated. https://gawkermediagroup.com/securedrop/ (last accessed Oct. 9, 2015).
[25] Media titan Conde Nast is a direct competitor of Gawker. See Erik Wemple, "*Conde Nast Exec Story: Gawker is Keeping its Sleaze Game in Shape*," The Washington Post, July 17, 2015 (https://www.washingtonpost.com/blogs/erik-wemple/wp/2015/07/17/conde-nast-exec-story-gawker-is-keeping-its-sleaze-game-in-shape/ last accessed Oct. 9, 2015)

50.     Reports surfaced that the article might have been based on false accusations, a hoax even.[27]

51.     Even if true, Geithner was a limited public figure at best.

52.     There had been no previous public knowledge of Geithner's sexuality as anything other than heterosexual.

53.     Subsequent to the publication of the Gawker piece purporting to "out" Geithner as a closet homosexual, other media outlets began to scrutinize Gawker's reporting of the story.

54.     The source of the article was the alleged gay prostitute and porn star Leif Derek Truitt (porn alias Brodie Sinclair) - a man the Gawker article referred to as "Ryan."

55.     Other news outlets interviewed "Ryan" and revealed him to be a deeply troubled man with paranoid delusions.[28]

56.     Worse, upon further investigation, it became likely Ryan's motivation for contacting Gawker, might have been to blackmail Geithner.[29]

57.     Gawker had taken <u>ONE WORKDAY</u> to investigate, vet, and publish the article on the Geithner "sex scandal."[30]

---

[26] Jordan Sargent, "*Conde Nast's CFO Tried to Pay $2,500 for a Night with a Gay Porn Star,*" Gawker, July 16, 2015 ( article has been removed from site but is available at https://archive.is/EUkg0#selection-1198.0-1200.0 last accessed Oct. 6, 2015).

[27] Charles Johnson, "*Is The Gawker Story An Elaborate Hoax? Sure Looks That Way,*" GotNews.com July 17, 2015 (http://www.gotnews.com/breaking-exclusive-is-the-gawker-story-an-elaborate-hoax-sure-looks-that-way/ last accessed Oct. 10, 2015).

[28] Chuck Ross, "*Interview With The Gay Porn Star Behind That Terrible Gawker Article,*" The Daily Caller, July 17, 2015 (http://dailycaller.com/2015/07/17/exclusive-interview-with-the-gay-porn-star-behind-that-terrible-gawker-article/ last accessed Oct. 9, 2015).

[29] Robby Soave, "*Gawker Helps Gay Escort Blackmail Timothy Geithner's Brother, Ted Cruz Is the Hero of the Story,*" Reason Magazine, July 17, 2015 (https://reason.com/blog/2015/07/17/gawker-helps-gay-escort-blackmail-timoth last accessed Oct. 9, 2015).

[30] James West, "*Gawker Took Only One Day to Report and Vet the Story That Blew Up in Its Face,*" Mother Jones, Friday July 24, 2015 (http://www.motherjones.com/media/2015/07/gawker-conde-nast-fallout-timeline-denton last accessed October 9, 2015).

58.     Gawker's actions demonstrated that the *rush to publish* clearly outweighed any concern for the accuracy of the reporting.

59.     In criticizing Gawker's coverage of the Geithner story, the Washington Post said: "Shadowy encounters plus possible criminal activity plus high-ranking official in the classic New York industry of publishing equal a pretty automatic editor decision at the gossip site. Publish! The rest of the world, meanwhile, screams in condemnation…"[31]

60.     "Ryan" believes the end of the world is near because since 1980 the numbers 666 have been selected as the winning lottery number 25 times; that 9/11 was carried out by the Russian government; that Barack Obama is the "son of the devil;" that he ("Ryan") has ultra secret information that he *must* release to the media about who *really* is responsible for the Pennsylvania train crash of May 2015, and the downing of Malaysian Airlines Flight 370.[32]

61.     "Unfortunately, I'm just a guy who has a lot of information. I wish I didn't," was "Ryan's" explanation to one news outlet.[33]

62.     Gawker founder Nick Denton, in explaining its decision to take down the story, gave a non-apology apology, apologizing merely for being insensitive, and for *arguably* participating in "gay-shaming."[34]

63.     Denton issued a weak-hearted apology, but also stated, "The point of [the Geithner sex scandal story] was not in my view sufficient to offset the embarrassment to the subject and his family."[35]

---

[31] Erik Wemple, "*Conde Nast Exec Story: Gawker is Keeping its Sleaze Game in Shap*e," The Washington Post, July 17, 2015 (https://www.washingtonpost.com/blogs/erik-wemple/wp/2015/07/17/conde-nast-exec-story-gawker-is-keeping-its-sleaze-game-in-shape/ last accessed Oct. 9, 2015)
[32] Chuck Ross, "*Interview With The Gay Porn Star Behind That Terrible Gawker Article*," The Daily Caller, July 17, 2015 (http://dailycaller.com/2015/07/17/exclusive-interview-with-the-gay-porn-star-behind-that-terrible-gawker-article/ last accessed Oct. 9, 2015).
[33] *Id.*
[34] Nick Denton, "*Taking a Post Down*," July 17, 2015 (http://nick.kinja.com/taking-a-post-down-1718581684 last accessed Oct. 9, 2015).

64.     A former Gawker writer, Current *Vanity Fair* contributor Richard Lawson, publicly admitted that during his time at Gawker he fabricated stories.[36]

65.     Lawson has said, "When I was at Gawker I wrote baseless posts accusing an actor of raping an ex-boyfriend. I did it [because] my boss told me to, but I wanted to, too."[37]

66.     The fabricated articles Lawson referenced were a series of articles he wrote which accused actor James Franco of (a) being a closeted homosexual, and (b) having **raped** a man and then paid the victim to keep him quiet.

67.     The articles by Lawson are attached and incorporated herein as *Exhibits* 3-7.

68.     In a third article, entitled, "The People Have Spoken, And They Think James Franco is a Rapist,"[38] Lawson concludes, based upon the polling he did from the commenters in the previous post, that James Franco is the rapist that The New York Post was reporting on.

69.     A month later, in a fourth article entitled, "'Gay Rapist' Actor Surprisingly Cool About His Sexuality,"[39] Lawson <u>again</u> revisited the topic:

---

[35] *Id.*

[36] Larry Womack, "*Anyone Else Think James Franco Should Sue the Hell Out of Gawker,*" Huffington Post, July 17, 2015 (http://www.huffingtonpost.com/larry-womack/james-franco-gawker_b_7816032.html last accessed Oct. 10, 2015).

[37] *Id.*

[38] Richard Lawson, "*The People Have Spoken And They Think James Franco Is a Rapist,*" Gawker, August 22, 2008 (http://gawker.com/5040524/the-people-have-spoken-and-they-think-james-franco-is-a-rapist last accessed Oct. 10, 2015).

[39] Richard Lawson, "'*Gay Rapist' Actor Surprisingly Cool About His Sexuality,*" Gawker, September 29, 2008 (http://gawker.com/5056330/gay-rapist-actor-surprisingly-cool-about-his-sexuality last accessed Oct. 9, 2015).

Is James Franco gay or what? You'll remember there was that ominous rumor that he once raped his gay lover that was sort of intense and icky. We're told that the original tip that prompted the *Page Six* blind item, about an actor who broke into his ex–boyfriend's house an sexually assaulted him, mentioned Franco specifically. We received several other anonymous (and admittedly questionable) emails saying the same thing, one providing explicit details. So who the heck knows, but for whatever reason the rumor had traction. Which makes us queasy. But now the actor is on the cover of *Out* magazine this month, acting calm, collected, and confident in his heterosexuality, so we're all confused again. In the interview, he discusses

70.     The excerpt above alleges several things:

(a) that there was an ominous rumor that Franco once raped his gay lover;

(b) that Gawker, Lawson or both received some information from some source to suggest that the original New York Post article about the unknown actor come gay rapist was actually based on a "tip" from a source, and that in the original telling of the "tip" the actor-culprit was reported to be Franco;

(c) that Gawker, Lawson or both have received multiple anonymous emails which, although questionable in their reliability, nevertheless name Franco as the unknown gay rapist from the New York Post article;

(d) Lawson states that he doesn't know if the rumor about Franco is true, but that the rumor had "traction";

(e) that the rumor makes Lawson and possibly other Gawker staff "queasy"; and

(f) that Gawker staff or Lawson or both are uncertain as to Franco's true sexuality, given his decision to grace the cover of "Out" Magazine.[40]

71.     Lawson knew, because he fabricated the entire story, that any anonymous emails naming Franco as the gay rapist *were not only questionable, but were actually false*.

72.     The tone of this article is one of reporting on actual events.

---

[40] Out, "is a popular gay and lesbian fashion, entertainment, and lifestyle magazine, with the highest circulation of any gay monthly publication in the United States." (https://en.wikipedia.org/wiki/Out_(magazine) last accessed Oct. 10, 2015).

73.     Despite directly expressing belief that Franco was a "gay rapist," Lawson's presentation of facts is deliberately misleading and was designed to perpetuate a rumor that Franco was a "gay rapist."

74.     Gawker published (the author was simply listed as "Gawker Sources") an article in March of 2012 entitled, "Which Beloved Comedian Likes to Force Female Comics to Watch Him Jerk Off?"[41]

75.     The article recounts *anonymous tips* that some **unnamed comedian** - "our nation's most hilarious stand-up comic and critically cherished sitcom auteur … traps unsuspecting women in his hotel room and makes them stick around until he's done [masturbating]."

76.     The article went on to give additional details, recounting a story about the same **unnamed comedian** from the "Aspen Film Festival a few years ago" wherein the unnamed comedian trapped two women in a hotel room and forced them to watch him masturbate.

77.     Thereafter, as the article explains, the unnamed comedian's "extremely powerful" manager contacted the women and threatened to destroy their careers if they complained.

78.     The article detailed attempts to reach out to one of the unnamed victims, but the victim refused to comment, stating only, "first of all, your facts are wrong. And secondly, I don't want to be a part of this story. I'm sure you understand."[42]

---

[41] Gawker Sources, "*Which Beloved Comedian Likes to Force Female Comics to Watch Him Jerk Off,*" Gawker, March, 19, 2012 (http://gawker.com/5894527/which-beloved-comedian-likes-to-force-female-comics-to-watch-him-jerk-off?comment=48089921 last accessed Oct. 9, 2015.)
[42] *Id.*

79.     Subsequently, in <u>May of 2015</u>, Gawker's subsidiary blog website called "Defamer"[43] published an article written by Jordan Sargent entitled, "Louis C.K. Will Call You Up To Talk About His Alleged Sexual Misconduct."[44]

80.     The article introduces an unnamed source given the pseudonym "Jason."

81.     "Jason" explained that two female friends of his had been mistreated by Louis C.K., but the only incident described by "Jason" is supposedly from 2014, wherein Louis C.K. purportedly came up behind the one friend, grabbed her by the back of the neck and whispered, "I'm going to fuck you."

82.     On the basis of this, Jason is reported as having had an email communication with Louis C.K.,[45] wherein Jason accuses C.K. of sexual assault and C.K. responds by asking Jason for his telephone number.

83.     The section written by <u>paid</u>-Gawker-content-creators does not accuse Louis C.K. However, many **anonymous**, unpaid-content-creators (Kinja commenters) *do name* Louis C.K. in the 2012 article. In fact, the 2015 article cites as evidence, comments by unpaid-content-creator-commenters on the 2012 article:

> This was not the first allegation of sexual misconduct levied against C.K. In March of 2012, we ran a blind item titled "Which Beloved Comedian Likes to Force Female Comics to Watch Him Jerk Off?," which described an incident that had supposedly taken place in Aspen a few years prior involving "our nation's most hilarious stand-up comic and critically cherished sitcom auteur" and two unnamed female comedians:

---

[43] "Defamer" is a subsidiary blog within the Gawker family of sites. The content theme is self-explanatory. http://defamer.gawker.com.

[44] Jordan Sargent, "Louis C.K. Will Call You Up to Talk About His Alleged Sexual Misconduct," Defamer-Gawker, May 5, 2015 (http://defamer.gawker.com/louis-c-k-will-call-you-up-to-talk-about-his-alleged-s-1687820755 last accessed Oct. 9, 2015).

[45] The article published screenshots of the supposed emails with C.K. as well as the actual email address purportedly belonging to Louis C.K.

84.    The article cites to "Barberaham Lincoln," an independent content creator who claims to have a great deal of comedy industry insider knowledge, but without any substantiation whatsoever.

85.    The article closed by mentioning additional unsuccessful attempts to corroborate the allegations as being properly against Louis C.K. The attempts purportedly failed because "Jason's" female friends who were assaulted refused to come forward, citing their fear of C.K.'s power in the comedy industry.

86.    The article says that thereafter, the two men had a vacuous phone conversation, wherein, C.K. was "sizing [Jason] up' to 'find out what I had heard.'"

87.    The article closes with a call to action, asking unpaid content creator commenters to comment with any information they have.

88.    The Louis C.K. articles compared with the previous described ethical lapses, *supra*, represent a pattern at Gawker: recklessly publishing sensational claims (e.g., rape, sexual assault, serial rape and sexual assault) which carry the prospect of career destruction[46] on the basis of weak, unsubstantiated tips.

89.    A further pattern is using their anonymous-unpaid-content-creator-commenters as sources in their own right, but which in effect amounts to Gawker citing to itself.

90.    In this way, Gawker can be the source of the rumor, and then repeatedly earn revenue on subsequent articles based upon the rumor it itself initiated.

91.    Gawker's sites offer readers, paid Gawker staff, and others an opportunity to create content on the individual web pages carrying stand-alone writings of a particular subject matter.

---

[46] See generally, Bill Cosby.

92.     The stand-alone writings are *consciously* and *deliberately* **initiated** by journalists such as Defendants Trotter and Howard.

93.     The only restrictions on the content created by the readers, is that readers cannot initiate the stand-alone writings, their content is placed on the webpage - first come, first serve - beneath the portion of the writing begun by the initiator, and their content creation is subject to being kept under a removable veil until "approval" by the initiator of the stand-alone writing.

94.     Readers can, at their own option, lift the veil and view the content created by non-initiating content creators, regardless of whether or not the stand-alone writing's initiator approves or disapproves of the content.

95.     In order to create content, a non-initiating content creator must create a content creator profile titled under their real name or under a pseudonym.

96.     It is very common for non-initiating content creators to create anonymous profiles, or even multiple anonymous profiles.

97.     It is very common for initiators of writings (such as Defendants Howard and Trotter) to create content **amongst other non-initiating content creators**, and to directly *respond-to* and *collaborate* with non-initiating content creators, *instigate* and *solicit* responses from non-initiating content creators, and *adopt the conclusions* of or otherwise *advertise* or *approve* of the content of non-initiating content creators as signified through text content or by hyperlinking[47] to additional locations on the same webpage or the webpages of other stand-alone writings.

98.     Beginning in August of 2014 shortly after the death of Michael Brown, Plaintiffs began investigating matters relating to the death of Brown, and also the subsequent riots.

---

[47] A **hyperlink** is "an electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or a different document." http://www.merriam-webster.com/dictionary/hyperlink last accessed June 17, 2015.

99.     The Brown death and the Ferguson Riots were among the top media stories in the St. Louis, Missouri media market for 2014.

100.     The riots destroyed large swaths of Ferguson, Missouri, nearly overran police positions on multiple occasions and resulted in multiple US Department of Justice investigations, public official firings, and additional riots throughout the St. Louis region, such that the Missouri Governor was forced to dispatch more than 2,000 National Guardsmen.

101.     Johnson personally traveled throughout the St. Louis region to report on events and also sources within local law enforcement and in various places regionally, who assisted him in his reporting.

102.     Local and national law enforcement sources provided Johnson with credible information which suggested that Michael Brown, as a juvenile, was implicated in a murder.

103.     As a result of these leads, Johnson has invested tens of thousands of dollars in trying to convince Missouri courts to unlock Michael Brown's juvenile records.

104.     In pursuit of this objective, Johnson has filed multiple lawsuits in multiple Missouri Circuit Courts.

105.     Upon ultimately being denied by the juvenile court of St. Louis County in mid-September 2014, Johnson temporarily halted his pursuit.

106.     Upon discovering that the records were not reviewed as part of the grand jury evidence, Plaintiffs resumed the legal battle for the records by appealing the denial to the Missouri Court of Appeals for the Eastern District of Missouri in late November, 2014.

107.     On or about December 4, 2014, a preliminary writ was granted by the Court of Appeals, but the writ was ultimately permanently denied on December 18, 2014.

108.    In May of 2015, Johnson appealed the records denial to the Missouri Supreme Court, which ultimately denied him the records.

109.    As a result of his reporting, and his exposure of facts which did not fit the common and hackneyed narrative pushed by Gawker[48] and other media entities external to St. Louis, Missouri, Plaintiffs became a very popular news and opinion website for readers in the St. Louis Region, which is shown by data tracking Plaintiff GotNews' website's traffic.

110.    Plaintiffs' reputation amongst St. Louisans became very positive and Plaintiffs' brand, goodwill, and website traffic, all surged, as evidenced by a sudden increase in Plaintiffs' web traffic.

111.    Between September of 2014 and February of 2015, Got News enjoyed an online readership of nearly 83,000 people in Missouri, including at least 37,441 in the St. Louis Region.

112.    Gawker staff first began to track the career of Plaintiff Charles Johnson during the summer of 2014.[49]

113.    Johnson is generally of a different ideological persuasion then the Defendants.[50]

114.    On December 4, 2014, Defendant Greg Howard published an article entitled, "Charles Barkley Has Nothing to Say to America."[51]

115.    In his article, Howard stated:

---

[48] For example, one Gawker editor has encouraged hackers to steal former Officer Darren Wilson's money. The general implication being that Wilson is a racist murderer. See Charles Johnson, "*Gawker Blogger Calls for Hackers to Steal Darren Wilson's Money,*" Gotnews, September 9, 2014 (http://gotnews.com/gawker-blogger-calls-hackers-steal-officer-darrenwilsons-money/ last accessed Oct. 9, 2015).

[49] See, e.g., Adam Weinstein, "*Is Ratfucking Journalism Dead*?" Gawker, July 8, 2014 (http://gawker.com/is-ratfucking-journalism-dead-1601527887 last accessed Oct. 10, 2015).

[50] *Id.*

[51] See Greg Howard, entitled "Charles Barkley Has Nothing To Say To America," published by deadspin.com on December 4, 2014, available online at http://deadspin.com/charles-barkley-has-nothing-to-say-to-america-1666864783.

This conversation is over; there is not debate to be had about the killing of Eric Garner, and there really isn't one to be had on the degradation, imprisonment, and systemic murder of minorities. It is a system of control, a machine, doing the work it was designed to do. Those who blame its workings on its victims, invoking black pathologies and enumerating all the ways in which black people need to become better and more moral to earn the right to complain about being killed without their killers even facing any consequences, are engaging in an old, tired respectability politics. They don't know what the fuck they're talking about.

Charles Barkley does not know what the fuck he's talking about.

116.    In the "discussion" section beneath his article, Howard engaged in an extensive dialogue with an independent content creator and ultimately stated the following, demonstrating his position on the death of Michael Brown and those who believed Brown was not totally innocent:



*See* Ex. 40, Amended Complaint for the entire exchange.

117.    On December 5, 2014, one day after Defendant Greg Howard published his the article described immediately above, Plaintiffs published an article on the Gotnews website entitled, "BREAKING: GotNews Wins First Stage of Appeal on Michael Brown Records, #Ferguson."[52]

118.    In retaliation, on December 9, 2014, Defendants Howard and Trotter published three defamatory articles designed to malign and humiliate Plaintiffs.

119.    On or about the morning of December 9, 2014, Defendant Trotter composed, published, and initiated, a stand-alone writing entitled, "What Is Chuck Johnson, and Why? The Web's Worst Journalist, Explained," (referred to hereafter as "Trotter First").[53]

120.    In the article, Trotter maliciously characterizes Johnson as a racist, as well as using malicious paraphrasing to suggest that Johnson is a racist.

121.    In Trotter First, Defendant Trotter defamed, cast in a false light, and injured Plaintiffs by proceeding to attempt to show how Plaintiff Johnson was the "web's worst journalist," by juxtaposing Plaintiff Johnson's journalistic professionalism alongside screenshots (*provided with no accompanying context*) of defamatory, false, and injurious Twitter postings ("tweets") made by various persons, each of which openly requested that Twitter, Inc. staff permanently ban Plaintiffs from posting on twitter.com, and which defamed Plaintiffs by alleging, inter alia, that Plaintiffs were "stalking," "[h]arass[ing]," and otherwise "endanger[ing]," other individuals.

122.    In Trotter First, Defendant Trotter defamed, cast in a false light, and injured Plaintiffs by stating that Johnson drew attention to himself as a result of his **flawed reporting** in

---

[52] Gotnews, December 5, 2014 (http://gotnews.com/breaking-gotnews-wins-first-stage-appeal-michaelbrown-records-ferguson-ericgarner/ last accessed, Oct. 9, 2015).
[53] http://gawker.com/what-is-chuck-johnson-and-why-the-web-s-worst-journal-1666834902 last accessed, June 17, 2015.

the Senate Republican Primary race in Mississippi. ("he's drawn attention for his (flawed) reporting in the Senate Republican primary race in Mississippi"). As a further proof of the allegation of "flawed" reporting, Trotter linked to another news article, which itself drew no conclusion and offered no proof of error in Johnson's reporting in the Senate Republican Primary race in Mississippi.

123.    In Trotter First, Defendant Trotter defamed, cast in a false light, and injured Plaintiffs by paraphrasing a quote by Johnson, misleadingly stating that Johnson really meant that the deceased Michael Brown, Jr., who was killed by Ferguson, Missouri police officer Darren Wilson, "**deserved to die**" *because* he was African American.[54] Trotter would go on to call this "racist."

124.    Importantly, Trotter is attacking Johnson's ability as a journalist, directly accusing him of *falsely reporting* in an article that senate candidate (for New Jersey) Cory Booker didn't actually reside in New Jersey at the time of his candidacy (thereby rendering him ineligible, if true). Trotter cites to another article[55] as evidence that Booker did in fact live in New Jersey, and thus proof that Johnson falsely reported.

125.    However, the article Trotter cites to *is itself inconclusive* on the matter.

126.    In Trotter First, Defendant Trotter defamed, cast in a false light, and injured Plaintiffs by stating that Johnson is, "well-known for publishing stories that fall apart under the slightest scrutiny. The list of Johnson stories that have been proven wrong is long, but his greatest hits include: … [e]rroneously reporting that former Newark Mayor Cory Booker didn't

---

[54] *See* Exhibit 16.
[55] Ruby Cramer, "*Cory Booker: Yes, I Live In Newark*," Buzz Feed News, Oct. 14, 2013 (http://www.buzzfeed.com/rubycramer/cory-booker-yes-i-live-in-newark#.lmZ115Wm1  last accessed Oct. 9, 2015).

actually reside in Newark[56] … Contributing reporting to the Daily Caller's infamous story about New Jersey Senator Bob Menendez allegedly soliciting prostitutes in the Dominican Republic. The Story turned out to be a complete fabrication,[57] and may have even been planted by the Cuban government."

127.    Johnson's article was not a lie, not a fabrication, and in fact the Senator has been indicted (March 6, 2015) by the Department of Justice on 14 counts, including corruption charges.[58]

128.    The *Department of Justice* reports that the allegations of sex with underage prostitutes in the Dominican Republic <u>has been corroborated</u>.[59]

129.    Trotter cites **<u>as proof</u>** that Johnson *fabricated* - that is, completely *invented* - the Menendez story, an article by ABC News,[60] which <u>does not reach a conclusion</u> and at best for Trotter, merely expresses doubt about Johnson's allegations in his article.

130.    Trotter, on the other hand, reports that **<u>conclusively</u>**, Johnson lied and made up the entire article.

131.    Trotter cited **<u>no</u>** other sources to support his statement that Johnson had fabricated the story about Senator Menendez.

---

[56] Defendant Trotter offered as proof, a link to a "Buzz Feed News" article which itself drew no conclusions and simply reported the perspectives of competing viewpoints. See Ruby Cramer, "Cory Booker: Yes, I Live in Newark," Buzz Feed News, October 14, 2013, http://www.buzzfeed.com/rubycramer/cory-booker-yes-i-live-in-newark#.dyPmMdGDX last accessed June 17, 2015.

[57] Here again, as supposed proof, Trotter inserted a link to an ABC News online article which simply reported on the controversy surrounding Senator Menendez and proffered no conclusions one way or another. See Rhonda Schwartz, Brian Ross and Ned Berkowitz, "The Menendez Prostitution 'Scandal': How It Happened." ABC News, March 6, 2013, http://abcnews.go.com/Blotter/robert-menendez-prostitution-scandal-happened/story?id=18664472 last accessed June 17, 2015.

[58] Chuck Ross, "*DOJ: Underage Prostitution Allegations Against Robert Menendez Backed By 'Corroborating Evidence*,'" The Daily Caller, August, 24, 2015 (http://dailycaller.com/2015/08/24/doj-underage-prostitution-allegations-against-robert-menendez-backed-by-corroborating-evidence/  last accessed Oct. 9, 2015).

[59] *Id.*

[60] Rhonda Schwartz, Brian Ross and Ned Berkowitz, "*The Menendez Prostitution 'Scandal': How It Happened*," ABC News Online, March 6, 2013 (http://abcnews.go.com/Blotter/robert-menendez-prostitution-scandal-happened/story?id=18664472 last accessed Oct. 9, 2015).

132.     In Trotter First, a number of anonymous, non-initiating content creators defamed, falsely portrayed, and injured Plaintiffs.

133.     Shortly after the initial section of Trotter First was published on gawker.com, several of such anonymous content creators published defamatory content on Trotter First.

134.     One such anonymous content creator, "*Cmcalumna*," claimed to have attended college with Johnson.

135.     Though she is anonymous, she suggests she has special knowledge of Johnson: "Hilariously, he graduated being best known for pooping on the (I think I'm remembering the floor right) 7th floor of Stark (a dorm)."

136.     She then let slip her motivation for releasing such a tidbit of information: "I'm sad this idiot is getting any attention at all, but I hope this guy becomes famous for the same reasons he was in college, his public pooping problems."

137.     *Cmcalumna* published false information about Johnson on Trotter First, cast him in a false light, and injured Johnson by stating as a matter of fact that Johnson publicly defecated in either the hallway or elevator of his dormitory in college.

138.     Defendant Trotter incited and solicited additional false, injurious and defamatory comments from *Cmcalumna* as well as other content creators on Trotter First.

139.     When another unpaid-content-creator asked *Cmcalumna* to "elaborate on the poop story," *Cmcalumna* replied, at **1:05pm** on December 9, 2014,[61] that since she started at college two years after Johnson, she didn't actually have any basis of knowing whether or not Johnson

---

[61] See Plaintiff's Ex. 18.

had publicly defecated. Rather, she simply described upper-classmen talking about it "regularly" but yet that it was an "undisputed fact that he did it."[62]

140.     At **1:44 p.m**. on December 9, 2014,[63] anonymous unpaid-content-creator "*CCJ Facebook Friend*" published a discussion directed at J.K. Trotter, in which he claims to faithfully reproduce, from Johnson's **Private**, **invite-only** Facebook account page, a letter written by Johnson and posted on Johnson's Facebook wall for dissemination to former classmates of his on Facebook. "This is from his Facebook account late last night. I don't know how to screenshot the whole thing."[64]

141.     *Notably, the letter posted by CCJ Facebook Friend is exactly the same as the one Greg Howard would publish two hours later in his post on Deadspin.*

142.     Greg Howard did not have access to Johnson's Facebook page, because they were not Facebook friends.

143.     On December 10, 2014,[65] Trotter would respond to *CCJ Facebook Friend*, seeking additional leads, information, collaboration: "Are there any other comments on that Facebook post?"

144.     Some anonymous content creators **begged** Defendant Trotter to write an article about the defamatory matters discussed by *Cmcalumna*, but Trotter informed the individual that Defendant Howard had already written, and initiated/published, on or about the afternoon of

---

[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*

December 9, 2014, a stand-alone writing on deadspin.com, entitled, "<u>Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?</u>" (hereafter, "Howard First").[66]

145.    At **4:19 p.m**. on December 9, 2014,[67] content creator "IkerCatsillas" posts a discussion piece (directed at Trotter) on the First Trotter article: "Please J.K. You gotta scoop this poop story for us. For journalism. I need to know more." At **4:43 p.m**.,[68] Trotter responds: "[Deadspin] is on it." The phrase "on it" is hyperlinked and links to Greg Howard's "clowntroll" article.

146.    On December 9, 2014 (<u>at 4:20 p.m.</u>), Trotter posted another article entitled, "The Daily Caller Can't Quit Chuck Johnson."[69]

147.    In the article, Trotter repeatedly states that Johnson wrote **false** stories.

148.    In Trotter Second, Defendant Trotter defamed, cast in a false light, and injured Plaintiffs reporting that Johnson contributed to a false story about New Jersey Senator Bob Menendez supposedly soliciting prostitutes in the Dominican Republic."[70]

149.    Between **2:00 p.m. and 2:14 p.m**. on December 9, 2014, Greg Howard **emailed** Charles Johnson and asked various questions:[71] "Chuck, we just got a tip that you wrote up a Facebook post for your past classmates. Just checking to see it actually happened and is accurate.

---

[66] http://theconcourse.deadspin.com/wait-did-clowntroll-blogger-chuck-johnson-shit-on-the-1668919746 last accessed, June 17, 2015.

[67] _Id._

[68] _Id._

[69] <u>See</u>  J.K. Trotter, entitled "The Daily Caller Can't Quit Chuck Johnson," published by gawker.com on December 9, 2014, available online at http://gawker.com/the-daily-caller-can-t-quit-chuck-johnson-1668910086.

[70] _Id._

[71] <u>See Plaintiffs Ex. 39</u>. Note that time appears as 11am because it was received by Charles Johnson in California at 11am (2 p.m. Eastern Time).

26

[The email goes on to quote a portion of the letter posted by *CCJ Facebook Friend* to the First Trotter article initiated/instigated at **11:25 am**.] This is your writing, correct? Thanks, Greg."[72]

150.    At **2:06 p.m**. on December 9, 2014,[73] Johnson responded: "Run it in its entirety. Don't do me like you did Cory Gardner, though."

151.    At **2:14 pm**. on December 9, 2014,[74] Johnson emailed Howard, stating, "Oh, and the comments about me shitting on the floor were made up," - referencing the *Cmcalumna* discussion post earlier at **12:30 pm and 1:05p.m**. on the Trotter article.

152.    At **2:20 p.m**. on December 9, 2014,[75] Howard again emailed Johnson: "If you have time, we got a tip that you had a 2002 bestiality charge expunged from your record because you were a minor at the time. Is this true?"

153.    Prior to Defendant Howard publishing Howard First, Plaintiff Johnson emailed Defendant Howard and categorically denied that incident that was the basis for the article's title ever occurred.

154.    At **4:00 p.m**., Greg Howard initiated/ "instigated" his piece, "Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?"[76]

155.    The article includes references to anonymous rumors that Johnson publicly defecated in college: "there are cryptic comments from friends and former classmates about some mysterious floor-shitting incident." Howard then proceeded to solicit additional tips, photos, and context from additional Kinja content-creators.

---

[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] http://theconcourse.deadspin.com/wait-did-clowntroll-blogger-chuck-johnson-shit-on-the-1668919746 last accessed Oct. 9, 2015).

156.    In Howard First, Defendant Howard also created content amongst other non-initiating content-creators, soliciting information from them as well as adopting and advertising defamatory content published by *Cmcalumna* on the Trotter First website, encouraging other readers and content creators to view the defamatory statements by hyperlinking to *Cmcalumna's* published content. ("I'll tell you what. There is some good-ass kinja to be had re: Chuck shitting on the floor one time over at Gawker [hyperlink inserted into the text]").

157.    "Kinja" refers to Gawker's proprietary social-media, media content aggregating tool that readers, content creators and others use to collect and view content created on various Gawker media property websites.

158.    The phrase "good-ass kinja" refers to high quality content that readers, content creators, and others would be advised to view.

159.    Stating that particular content is "good-ass kinja," as well as instantly providing the link to said content, serves as express endorsement of the linked content, and Defendant Howard intended to direct as many readers as possible to view the defamatory content.

160.    By adopting, endorsing, advertising, responding to, interacting with, and directing additional content-creators, readers, and others to such defamatory, false, misleading, and injurious content created by a non-initiating content creator, Defendants Howard and Gawker formally adopted and are liable for, all of *Cmcalumna's* content published on Trotter First and Howard First.

161.    Instead of basing his reporting of the public defecation on discussion posts on Trotter's article, Howard misrepresents that he saw such allegations on Johnson's Facebook

page. "Sure enough, on the Facebook post, there are cryptic comments from friends and former classmates about some mysterious floor-shitting incident."[77]

162.    However, as mentioned, Howard doesn't have access to this page. And in any event there were **no comments** made on Johnson's Facebook page during this time that referenced or alleged public defecation.[78]

163.    Howard lied about his source.

164.    To give the accusations greater weight, Howard reported that he saw them on Johnson's Facebook wall.

165.    Howard closed out his article by smearing and defaming Johnson further: "…[H]e's been caught lying many times before…"[79]

166.    Howard provides no evidence of Johnson having ever lied, nor does he provide any evidence that Johnson was ever caught lying.

167.    At **4:34 p.m**. on December 9, 2014,[80] Gawker writer Jordan Sargent posts a discussion post directed at Greg Howard on the "clowntroll" article, stating, "This guy shitting on the floor is a very apt metaphor for why he's in the news now."

168.    At **5:09 p.m**. on December 9, 2014,[81] *ChekhovsGum(ItsGonnaPop!)* wrote a discussion post on the First Trotter article, and directed at Cmcalumna: "I have heart breaking news, team, there was never any proof that he actually was the one who pooped on the floor. Someone did poop on the floor and just to sort of troll the Mountain King himself, people started

---

[77] See Plaintiff's Ex. 14.
[78]   See Plaintiffs' Ex. 37. These screenshots evidence that Howard lied about where he saw the floor defecating comments, as there were no floor defecation comments on Johnson's Facebook page.
[79] See Plaintiff's Ex. 14.
[80] *Id.*
[81] *Id.*

posting that he pooped. It was one of those things no one could proof or disprove … but alas it's not *really* true."

169.    At **10:26 p.m**. on December 9, 2014,[82] *Cmcalumna* wrote a discussion post on Howard's Deadspin "clowntroll" article, replying to Greg Howard's previous discussion post ("…There is some good-ass kinja to be had re: chuck shitting on the floor one time over at Gawker") i*n which she clarifies that she has no proof of the defecation incident having occurre*d: "I think you made my year **by writing an entire article based on my comment**. I'd give anything to have some proof, but I wasn't there when it occurred … I am so glad when someone googles his name this will appear. I hope him pooping in stark [dorm] follows him forever, just goes to show you how important it is to use a bathroom (and not be an asshole your entire life)." (emphasis added).

170.    *Cmcalumna* had no proof, therefore, that Johnson publicly defecated, but yet she was extremely pleased that Howard wrote his article based upon her comment.

171.    Later in the day on or about December 9, 2014, after Defendant Howard had published content directing viewers to *Cmcalumna's* defamatory, false, and injurious content, *Cmcalumna* published additional content as a direct response to Defendant Howard's publication (i.e., "There is some good-ass kinja to be had…").

172.    On **December 9, 2014**, sometime shortly after *Cmcalumna* initiated the rumor about public defecation, the first "tweet" was published on Twitter. See Plaintiffs Ex. 8.

---

[82] See J.K. Trotter, entitled "The Daily Caller Can't Quit Chuck Johnson," published by gawker.com on December 9, 2014, available online at http://gawker.com/the-daily-caller-can-t-quit-chuck-johnson-1668910086.

173.    Also on **December 9, 2014**, sometime after instigating his article, Howard himself tweeted on Twitter:[83] "We need answers: Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?" He then posted a link to the article he instigated.

174.    Defendant Howard would have been uniquely and particularly made aware of *Cmcalumna's* publication on the writing Howard had initiated.

175.    Plaintiff Johnson repeatedly requested that Defendant Howard publically retract his defamatory statements, but Defendant Johnson refused.

176.    When *Cmcalumna* ultimately posted a discussion post reply directly to Howard, informing him in no uncertain terms that she had absolutely no basis of knowledge as to whether or not Johnson publicly defecated, Howard still refused to print a retraction.

177.    On **December 12, 2014**, at **12:42 p.m.**,[84] Trotter emailed Charles Johnson: "Hi Charles, I'm a reporter at Gawker, and I'm writing because we've received a pair of allegations involving you, and wanted to give you an opportunity to address them.[85] The second allegation is that, in 2002, you were photographed sexually assaulting a sheep behind a family member's ranch in San Bernardino County, near Wrightwood; that you were arrested by the San Bernardino County Sheriff and later convicted of this; and that, in 2007, you successfully petitioned to have records of the incident expunged. Is this allegation true? The sources for both claims supplied detailed accounts of each of the incidents described above. Please let me know if you have any other questions, or if you need any other information to address these allegations. My working deadline is midnight EST, but that is flexible, so please let me know if you require more time."

---

[83] See Plaintiffs' Ex. 29.
[84] The first rumor Trotter discusses is not part of this suit and is therefore omitted from the excerpt. Please see Plaintiffs' Ex. 38 for the full text. *Id.*
[85] *Id.*

178.   Johnson responded:[86] "Neither story is true. I honestly have no idea where these crazy stories come from."

179.   On **December 12, 2014**, at **4:08 p.m**.,[87] Trotter would follow up with Johnson: "The first story comes from a person who says they were physically present, and personally witnessed the conversation. We've verified that this person attended Claremont with you. This person provided a very specific account of the incident. The second story comes a person [sic] who is friends with an officer in the San Bernardino County Sheriff, who is familiar with the details of the alleged assault. Apparently the incident has become fairly well-known within that county's law enforcement circles. Again, I just wanted to get your input before putting anything up. I'm fairly sure you understand that."

180.   On or about December 15, 2014, Trotter wrote, published, and initiated a writing entitled, "Which of These Disgusting Chuck Johnson Rumors are True?" (hereafter, "Trotter Third").[88]

181.   **Also on December 15, 2014**,[89] Greg Howard published on his Twitter social media account a hyperlink to Trotter's instigated article ("Which of These Disgusting Rumors…") and stating: "Torn. I kinda feel like sheepfucking is something you grow into. On the other hand, [Charles Johnson] is a prodigy."

182.   In Trotter Third, Defendant Trotter presented disgusting rumors which were not items of public concern prior to Defendants collective creation, collaboration, publication and incitation.

---

[86] *Id.*

[87] *Id.*

[88] http://gawker.com/which-of-these-disgusting-chuck-johnson-rumors-are-true-1669433099 last accessed June 17, 2015.

[89] See Plaintiffs' Ex. 1.

183.    In Trotter Third, in which Defendant Trotter describes the initiated writing as a "RUMORMONGER[ING]"[90] published writing, Trotter defamed, misleadingly and falsely portrayed, and injured Plaintiff Johnson by heavily quoting from *Cmcalumna's* false and defamatory content published in Trotter First, wherein *Cmcalumna* stated that she knew from either personal knowledge or from other certain, undisclosed evidence, that Johnson defecated in public.

184.    Specifically, Trotter stated, "there is no evidence of Chuck Johnson took a shit on the floor in college. Chuck Johnson was, however, so **thoroughly disliked** in college that his classmates chose to blame an unattributed shit on him."

185.    Trotter also stated, "There is **no evidence** that Chuck Johnson was arrested in 2002 for pinning a sheep to a fence and fucking it. Johnson is, however, **the kind of guy** about whom random people make up and circulate rumors about him being arrested in 2002 for pinning a sheep to a fence and fucking it."

186.    However, similar to Lawson's conclusions in the fourth "gay rapist" James Franco article, Trotter suggests the bestiality and public defecation rumors might be true, because it cannot be confirmed or denied, but stated, "A search through public records and the archives of local newspapers did not turn up any mention of an arrest matching the one our source described. (This does not necessarily mean that the arrest didn't occur, though; editors don't necessarily publish all incidents involving the police, and public records databases would not contain an expunged record.)"

---

[90] Rumermonger: a person who spreads rumors. http://www.merriam-webster.com/dictionary/rumormonger last accessed June 17, 2015.

187.    After instrumentally generating minor interest at least as to the rumor of public defecation, Defendant Trotter concocted a false, misleading, pseudo-journalistic device to make it appear to a casual viewer that he was merely reporting on a pre-existing matter of public concern. ("You may have read The New York Times' profile of Charles C. Johnson, the worst journalist on the internet. You also may have seen several very elaborate, very unbelievable, and very gross rumors about Johnson's past misdeeds floating around Twitter and Facebook. So maybe you're wondering: Which of those rumors are real?").

188.    In Trotter Third, Defendant Trotter reported that Defendant Howard had previously written about allegations of public defecation as against Johnson.

189.    Discussing a rumor ("Rumor 1: Johnson shit on the floor in college"), Defendant Trotter then reported that *two* of Johnson's college classmates, writing anonymously on Gawker,[91] had stated as a matter of fact that Johnson had defecated publicly at college. Trotter then purported to quote from, and hyperlinked to, various publications on Trotter First by two anonymous, non-initiating content-creators: *Cmcalumna* and *ChekhovsGum(ItsGonnaPop!)*.

190.    However, Defendant Trotter acknowledged that *ChekhovsGum(ItsGonnaPop!)* did not make such a statement about public defecation actually occurring. Rather, *ChekhovsGum(ItsGonnaPop!)* stated that while *some* person did in fact defecate in the dormitory, several years ago, it was not Johnson, and that any attribution to Johnson was out of extreme spite.

191.    Thus, as evidenced by the writing in Trotter Third, Defendant Trotter's **only basis** upon which to base his reporting were the publications of a *single, anonymous content creator (Cmcalumna), made on an article Trotter himself had initiated and published*.

---

[91] Trotter describes them as being classmates of Johnson, but does not describe the basis of his knowledge that they were, in fact, classmates of Johnson. Trotter also describes them as having used "burner" Gawker content creator profiles. A "burner" profile is slang for an anonymously created non-initiating content-creator account.

192.   The manner in which Defendant Trotter wrote the initiating portion of the writing was designed to give the audience the impression that Defendants Trotter and Howard were privy to special and hidden information, and this created an atmosphere in which the rumors could be perceived as being more true than false, even though Trotter and Howard had serious reason to believe they were false.

193.   For example, in Trotter Third, Defendant Trotter also **failed to report** that *Cmcalumna* had, subsequent to stating that it was "an undisputed fact" that Johnson had publicly defecated, recanted that statement and other similar statements, directly to Greg Howard.

194.   Further, Trotter failed to mention that *Cmcalumna* had expressed extreme hatred of Johnson and had deliberately defamed him.

195.   In Trotter Third, Trotter deliberately misattributed and omitted facts in order to mislead readers into believing there was a factual basis to the allegation that Johnson had publicly defecated.

196.   Thus, any reader would be left with the impression that Johnson may have defecated publicly, even though Defendant Trotter himself had reason to know that this was not the case.

197.   In Trotter Third, Defendant Trotter also reported upon the investigation he and Greg Howard had conducted into a "tip" that Johnson had "<u>fucked a sheep</u>."

198.   Defendant Trotter wrote that his source had told him that "Chuck had a 2002 bestiality charge expunged from his record due to his being a minor, 14 at the time."

199.   Similar to the previous rumor, Defendant Trotter did not divulge any information about his source and the basis of knowledge.

200.    Defendant Trotter continues on to describe his attempt to verify the allegations made in the "tip," and also describes an additional tipster who called Defendant Howard on the telephone and relayed a graphic allegation of Johnson having sex with a sheep, and Trotter recounts the allegation at length with enough detail to seemingly lend credence to the allegation. ("[Johnson] was spotted attempting to copulate with his wool sheep. The neighbor took pics with a telephoto lens, which, since the cops didn't catch him mid-act, were used as the basis for his conviction. He was pants-down, pinning the sheep against the fence … [Johnson] got it expunged in 2007 saying he was just a kid experimenting").

201.    Defendant Trotter also recounted that he and Defendant Howard had contacted the San Bernardino County district attorney's office seeking Johnson's juvenile records related to the alleged charge of bestiality, and that a representative at the juvenile division there said that the office could not divulge information pertaining to individuals arrested and charged as juveniles, "as Johnson allegedly was."

202.    Important to note, Plaintiffs have come under intense, hateful criticism for having sought the juvenile records of Michael Brown, Jr.

203.    Trotter Third is simply a play-by-play account of reporting on largely self-created or incited rumors on matters which at no point were a matter of public concern.

204.    The Trotter Third content described above is false, misleading, injurious, and intrinsically malicious and defamatory.

205.    Upon publication of the initiating segment of Trotter Third, Defendant Howard published a statement using his Twitter account (@greghoward88) to advertise, endorse, and direct viewer traffic to Trotter Third. ("torn. i kinda feel like sheepfucking is something you

grow into. on the other hand, @chuckcjohnson is a prodigy. [link to Trotter Second as well as screenshot of the article]"

206.    Trotter, Howard, and other Gawker paid content creators communicated in the discussion/comments section of Gawker articles and actively sought additional defamatory statements to be published.

207.    Gawker has a history of soliciting defamatory comments from unpaid content creators and then using such defamatory content as an excuse to publish "news" articles discussing the merits of the incited rumors.

208.    Gawker specifically attempts to utilize the nature of the initiator of the defamatory content (i.e., the anonymous unpaid content creator publishing on Gawker's articles) and illusory non-agency of the same as a tool to attempt to circumvent liability for the defamatory comments.

209.    A significant number of Gawker's readers visit their sites primarily to read the discussion/comments sections.

210.    Defendant Howard's @greghoward88 Twitter account reaches nearly thirteen thousand (13,000) individual followers nationally, including numerous followers throughout Missouri.

211.    Defendant Gawker's @gawker Twitter account is followed by and reaches in excess of five hundred and thirty-eight thousand (538,000) individuals.

212.    On December 9, 2015, @gawker published a "tweet" advertising Trotter Second.

213.    On December 15, 2015, @gawker published a "tweet" advertising Trotter One.

214.    Defendant Mr. Howard has a long history of defaming people whom he simply does not like or disagrees with.

215.    Jason Whitlock is a competing sports writer (Mr. Howard writes primarily for Deadspin.com a sports blog).

216.    Mr. Howard and other deadspin writers have set out to destroy Mr. Whitlock's reputation in a very similar way to their attacks on Mr. Johnson.

217.    They have fabricated stories about him and mischaracterized his statements.

218.    Mr. Whitlock is claiming that Howard has made up stories about him and encouraged Deadspin writers to use the word "nigger" twice, in stories about him.[92]

219.    It is apparent that Mr. Howard is trying to create the same sort of mischaracterized racial animus that he attributed to Mr. Johnson by mischaracterizing him and his ideas.[93]

220.    Mr. Howard and Gawker have a long and continuing history of creating offensive libelous material about those who disagree with them.

221.    Howard, Trotter, Gawker, and independent content creators *Cmcalumna*, *ChekhovsGum(ItsGonnaPop!)* conspired together through Gawkers' "Securedrop" and "burner accounts" systems to deny Plaintiffs' their property right to lawsuits for defamation against the anonymous content creators under the 14th Amendment to the United States Constitution.

222.    Howard, Trotter, Gawker, and independent content creators *Cmcalumna*, *ChekhovsGum(ItsGonnaPop!)* conspired together to defame Plaintiffs.

223.    Plaintiffs hereby incorporate by reference, as if fully stated herein, Exhibit 42, consisting of statements A-AJ, for Counts I-IV against Gawker, Howard, and Trotter.

---

[92] See Jake O'Donnell, entitled "Jason Whitlock Goes All-In on Deadspin, Greg Howard Responds With Pure Fire," published by sportsgrid.com on October 15, 2015, available at http://www.sportsgrid.com/uncategorized/jason-whitlock-goes-all-in-in-fued-with-deadspin-greg-howard-responds/
[93] *Id.*

224.    Each of statements A-AJ in Exhibit 42 are provably false, reasonably capable of being interpreted by the trier of fact as having a defamatory meaning, were published with malice, were published with knowledge that they were false or with reckless disregard for their veracity, were not opinions, were not published solely for the purpose of satire or humor, were not neutrally or fairly reported, were not matters of public concern, and were defamatory when taken in their literary contexts.

225.    As to each of statements A-AJ, *supra*, Plaintiffs have been damaged in reputation and have suffered pecuniary damages of lost business and lost investments due to damaged business reputation, as well as the need for Plaintiff to file this lawsuit to defend his good name and the related costs from attorney's fees, in an amount exceeding $2,000,000.

### Counts I and II: Defamation and Injurious Falsehood
(Against Defendants Gawker and Trotter)

226.    Plaintiff restates and incorporates by reference, as if fully set forth herein, all prior allegations of this Complaint.

227.    This claim arose in St. Louis County, Missouri.

228.    However, the claim is also cognizable in California and throughout the United States.

229.    On or about December 9, 2014 and again on December 15, 2014, Defendants Trotter and Gawker composed and published three internet news articles including statements about Plaintiff's person and Plaintiff's business.

230.    Defendant J.K. Trotter was at fault in publishing the articles described in paragraph 64 and knew that the statements were libelous when published.

231.    The statements described in paragraph 229 (and 223-225) were defamatory in that they asserted -through false statements- that Plaintiff Charles C. Johnson is an unskilled and

incompetent journalist and also that during his college life he was involved in a number of unsavory incidents. Specifically, the statements included the following direct quotations:

    a.    From the December 9, 2014 article titled "What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained"

        i.    "The list of Johnson stories that have been proven wrong is long, but his greatest hits include:

            1.    "Erroneously reporting that former Newark mayor Cory Booker didn't actually reside in Newark."

            2.    "Contributing reporting to the Daily Caller's infamous story about New Jersey Senator Bob Menendez allegedly soliciting prostitutes in the Dominican Republic. The story turned out to be a complete fabrication, and may have been planted by the Cuban government."

        ii.    Defendant Trotter states: "Earlier this year, [Johnson] collected screenshots of murdered teenager Michael Brown's Instagram account. (Quoting Johnson,) 'Brown's Instagram account also shows a violent streak that may help explain what led to a violent confrontation with Police officer Darren Wilson,' Johnson wrote. **In other words, Brown deserved to die.**" (emphasis added). This statement contains the induced allegation of fact that Plaintiff asserted Michael Brown deserved to die.

    b.    From the December 15, 2014 article titled, "Which of These Disgusting Chuck Johnson Rumors are True?"

        i.    In bold, "**Johnson shit on the floor in college.**"

ii.      Defendant Trotter's article then goes on to publish comments from Gawker readers who allege to be former classmates of Plaintiff:

1.      *"Hilariously, he graduated being best known for pooping on the (I think I'm remembering the floor right) 7th floor of Stark (a dorm). I'm sad this idiot is getting any attention at all, but I hope this guy becomes famous for the same reasons he was in college, his public pooping problems."*

2.      *I started two years after him, so I wasn't there since he did it as a freshman or sophomore. But the upperclassman talked about it regularly and **it was an undisputed fact that he did it.** Multiple people talked about it in great detail [confirmed by another commenter] on the school's paper/website the cmcforum.com and I bet many instances of people talking about it can be seen in the comment archives from 2008-2011.*

iii.     In bold, "**Johnson fucked a sheep.**"

iv.      Defendant Trotter again published comments posted to Gawker from individuals who claim to know Plaintiff:

1.      *Chuck had a 2002 bestiality charge expunged from his record due to his being a minor, 14 at the time.*

2.      *A friend is in the San Bernardino County Sheriff Dept. As I heard it, Chuck was about 14, had gone to stay with his cousins [for] a few weeks... He went for a weekend with one to a friend of the cousin's who owned a ranch near Wrightwood.*

41

> ***The father of the friend got suspicious when they caught him coming back inside very late the first night. The next night, he apparently wandered back out & got the cops called on him by a neighbor when he was spotted attempting to copulate with his wool sheep. The neighbor took pics with a telephoto lens, which, since the cops didn't catch him mid-act, were used as the basis for his conviction. He was pants-down, pinning the sheep against the fence.***
>
> *The story is still famous in circles of San Bernardino County law enforcement, apparently. He got it expunged in 2007, saying he was just a kid experimenting, and he didn't want it to reflect badly when he was in college working for collegiate newspapers. My friend won't give interviews, because he'd get in trouble for leaking expunged records, but it definitely happened, and word is that the files & pics still exist. Hope that helps!!*

232.    The above statements published by Defendant Trotter are statements of fact that are objectively falsifiable.

233.    The above statements published by Defendant Trotter are patently false.

234.    The statements described in 229- 233 (and 223-225) were published online and circulated around the entire United States. The statements were intentionally made available to and read by the general public in the state of Missouri.

235.     By his online publication of the statements described in paragraphs 229- 233 (and 223-225) Defendant Trotter intentionally targeted the state of Missouri and knew or should have known that residents of the state of Missouri would read the statements.

42

236.    The statements tend to deprive plaintiff of the benefit of public confidence and social and business associations, and the defendant published the statements knowing they were defamatory.

237.    Defendant Trotter intended to harm Plaintiff's interests by publishing the statements described in paragraphs 229- 233 (and 223-225) or Defendant Trotter recognized or should have recognized that such harm was likely.

238.    As a direct result of the publication of the statements described in paragraphs 229-233 (and 223-225) has been damaged in reputation, Plaintiff's business has been placed in jeopardy, and Plaintiff has suffered emotional injury, all to his damage in a sum to exceed $2,000,000.

239.    As a direct result of the publication of the statements described in paragraphs 229-233 (and 223-225), Plaintiffs Charles C. Johnson and Got News, LLC have been damaged in reputation and have suffered pecuniary damages of lost business and lost investments due to damaged business reputation, as well as the need for Plaintiff to file this lawsuit to defend his good name and the related costs from attorney's fees, in an amount exceeding $2,000,000.

240.    Defendant Trotter's conduct in publishing the statements described in paragraphs 229- 233 (and 223-225) was done with knowledge that the statements were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubt as to whether they were true, thereby warranting an award of punitive damages in a sum of not less than $20,000,000.

241.    Defendant Trotter was an agent, servant, and employee of Defendant Gawker, and as at all such times acting within the scope and course of his agency and employment; and/or his actions were expressly authorized by Defendant Gawker; and/or his actions were ratified by

Defendant Gawker, thus making Defendant Gawker liable for said actions under the doctrine of *respondeat superior*.

WHEREFORE, plaintiff prays judgment against Defendants Trotter and Gawker on Counts I and II of this Complaint and for such damages as are fair and reasonable, together with interest and costs, and such other and further relief, as the court shall deem proper.

### Counts III and IV: Defamation and Injurious Falsehood
(Against Defendants Gawker and Howard)

242.    Plaintiff restates and incorporates by reference, as if fully set forth herein, all prior allegations of this Complaint.

243.    This claim arose in St. Louis County, Missouri.

244.    However, the claim is also cognizable in California and throughout the United States.

245.    On or about December 9, 2014, Defendant Howard composed and published an Internet news article including statements about Plaintiff's person and Plaintiff's business.

246.    Defendant Greg Howard was at fault in publishing the articles described in paragraph 79 and knew that the statements were libelous when published.

247.    The statements described in paragraph 245 (and 223-225) as defamatory in that it asserted -through false statements- that Plaintiff Charles C. Johnson is an unskilled and incompetent journalist and also that during his college life he was involved in a number of unsavory incidents. Specifically, the statements included the following direct quotations:

a.    From the December 9, 2014 article titled "Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?"

i.    "[Johnson] gets things wrong *a lot*."

ii.     Defendant Howard states: "Sure enough, on the Facebook post, there are cryptic comments from friends and former classmates about some mysterious floor-shitting incident"

b.     In the Comments section, titled "Greg Howard's Discussions," on the article's webpage, Defendant Howard posts to himself, "Tell you what. There is some good-ass kinja to be had re: Chuck shitting on the floor one time over at Gawker."

i.     In the above-mentioned comment posted by Defendant Howard, the words "good-ass kinja" are hyperlinked to a comment by *Cmcalumna* on a Gawker article titled, "What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained."

ii.     *Cmcalumna's* comment, posted 12/09/14 at 1:05 PM, reads as follows:

1.     *I started two years after him, so I wasn't there since he did it as a freshman or sophomore. But the upperclassman talked about it regularly and it was an undisputed fact that he did it. Multiple people talked about it in great detail [confirmed by another commenter] on the school's paper/website the cmcforum.com and I bet many instances of people talking about it can be seen in the comment archives from 2008-2011.*

248.   The above statements published by Defendant Howard are statements of fact that are objectively falsifiable.

249.   The above statements published by Defendant Howard are patently false.

250.    The statements described in paragraphs 245-249 (and 223-225) were published online and circulated around the entire United States. The statements were intentionally made available to and read by the general public in the state of Missouri.

251.    By his publication of the statements described in paragraphs 245-249 (and 223-225) online, Defendant Howard intentionally targeted the state of Missouri and knew or should have known that residents of the state of Missouri would read the statements.

252.    The statements tend to deprive plaintiff of the benefit of public confidence and social and business associations, and the defendant published the statements knowing they were defamatory.

253.    Defendant Howard intended to harm Plaintiff's interests by publishing the statements described in paragraphs 245-249 (and 223-225), or Defendant Howard recognized or should have recognized that such harm was likely.

254.    Defendant Howard was an agent, servant, and employee of Defendant Gawker, and as at all such times acting within the scope and course of his agency and employment; and/or his actions were expressly authorized by Defendant Gawker; and/or his actions were ratified by Defendant Gawker, thus making Defendant Gawker liable for said actions under the doctrine of *respondeat superior.*

255.    As a direct result of the publication of the statements described in 245-249 (and 223-225) Plaintiff has been damaged in reputation, Plaintiff's business has been placed in jeopardy, and Plaintiff has suffered emotional injury, all to his damage in a sum to exceed $2,000,000.

256.    As a direct result of the publication of the statements described in paragraphs 245-249 (and 223-225) Plaintiffs Charles C. Johnson and Got News, LLC have been damaged in

reputation and have suffered pecuniary damages of lost business and lost investments due to damaged business reputation, as well as the need for Plaintiff to file this lawsuit to defend his good name and the related costs from attorney's fees, in an amount exceeding $2,000,000.

257.    Defendant Howard's conduct in publishing the statements described in paragraphs 245-249 (and 223-225) was done with knowledge that the statements were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubt as to whether they were true, thereby warranting an award of punitive damages in a sum of not less than $20,000,000.

WHEREFORE, plaintiff prays judgment against defendants in Count III and IV of his Complaint and for such damages as are fair and reasonable, together with interest and costs, and such other and further relief, as the court shall deem proper.

## Count V: Invasion of Privacy - False Light
### (Against All Defendants)

258.    Plaintiff restates and incorporates by reference, as if fully set forth herein, all prior allegations of this Complaint.

259.    Defendants have given publicity to fictional matters not of public concern, and have falsely and publicly attributed these fictional and outrageous acts to Plaintiffs in an effort to harm Plaintiffs.

260.    Defendants have twisted Plaintiff's words and the context in which they were made to such an extraordinary degree as to given them a highly offensive meaning not originally present, all in an effort to harm Plaintiffs.

261.    Defendants have presented Plaintiffs to the public in a false light, and either knew precisely that they were misrepresenting Plaintiffs to the public, or Defendants acted in reckless

disregard as to the falsity of the publicized matter and the false light in which Plaintiffs would be placed.

262.    As a direct result of the publication of the statements described in Counts I-IV, Plaintiff has been damaged in reputation, Plaintiff's business has been placed in jeopardy, and Plaintiff has suffered emotional injury, all to his damage in a sum to exceed $2,000,000.

263.    As a direct result of the publication of the statements described in Counts I-IV, Plaintiffs Charles C. Johnson and Got News, LLC have been damaged in reputation and have suffered pecuniary damages of lost business and lost business investments, due to damaged business reputation, as well as the need for Plaintiff to file this lawsuit to defend his good name and the related costs from attorney's fees, in an amount exceeding $2,000,000.

264.    Defendants' conduct in publishing the statements described in Counts I-IV was done with knowledge that the statements were false or with reckless disregard for whether they were true or false at a time when defendant had serious doubt as to whether they were true, thereby warranting an award of punitive damages in a sum of not less than $20,000,000.

WHEREFORE, plaintiff prays judgment against Defendants on Count V of this Complaint and for such damages as are fair and reasonable, together with interest and costs, and such other and further relief as the court shall deem proper.

### COUNT VI- 42 U.S.C. § 1983 - Conspiracy to Interfere with Civil Rights Under the Fourteenth Amendment
(AGAINST ALL DEFENDANTS)

265.    The allegations contained in all paragraphs above are incorporated by reference as if fully set forth.

266.    Because of Defendants' use of "securedrop" and "burner accounts," Plaintiffs are unable to identify anonymous content creators *Cmcalumna* and *ChekhovsGum(ItsGonnaPop!)*.

267.    For the same reasons, Plaintiffs are unable to serve the anonymous content creators with a lawsuit for defamation, and are thus unable to exercise their right to bring defamation claims against the independent content creators.

268.    Defendants have conspired for the purpose of depriving Plaintiffs their right to file a defamation lawsuit under the Fourteenth Amendment of the United States Constitution. *Zinermon v. Burch,* 494 u.s. 113 (1990).

269.    Specifically, Defendants Gawker, Trotter, and Howard conspired with anonymous content creators *Cmcalumna* and *ChekhovsGum(ItsGonnaPop!)* and others to defame Plaintiffs and deprive them of their civil rights by inciting defamatory rumors, developing means to keep anonymous content creators identities a secret, by then hiding behind the anonymous unpaid content creators while publishing the defamatory statements, and by refusing and potentially destroying any information which would allow the anonymous content creators to be identified.

270.    Defendant Gawker has demonstrated a track record and a procedure, which Plaintiffs have established, of inciting defamatory statements from anonymous content creators, publishing said statements, and then skirting liability by carefully and subtly publishing their own thoughts on the statements without confirming or denying them, playing it all off as "news."

271.    Defendants are state actors by virtue of their use of CDA § 230, in that they use that statute as a shield to enable them to take otherwise illegal and unconstitutional actions.

272.    When a state actor inserts itself between an individual and the individual's realization of his rights, such is Constitutionally impermissible.

273.    As a result of the foregoing, Plaintiffs Charles C. Johnson and Got News, LLC have been damaged in reputation and have suffered pecuniary damages of lost business and lost business investments, due to damaged business reputation, as well as the need for Plaintiff to file

this lawsuit to defend his good name and the related costs from attorney's fees, in an amount exceeding $2,000,000.

WHEREFORE, plaintiff prays judgment against Defendants on Count VI of this Complaint and for such damages as are fair and reasonable, together with interest and costs, and such other and further relief as the court shall deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury, on all issues in this case which are so triable.


Respectfully submitted,

**THE BURNS LAW FIRM** LLC


  /s/ John C. Burns
John C. Burns MO 66462
1717 Park Avenue
St. Louis, MO 63104
john@burns-firm.com
Telephone: (314) 932-2356
Facsimile: (314) 932-2171

## INDEX OF EXHIBITS

**EXHIBIT**                          **DOCUMENT**

1.              Tweet written by Greg Howard with a link to
                "Which of These Disgusting Chuck Johnson
                Rumors are true?" 12/25/2014

2.              Tweet written by Anna Merlan with a link to:
                "Wait Did Clowntroll Blogger Chuck Johnson Shit
                On The Floor One Time?" 12/9/2014

3.              Tweet written by Erin Gloria Ryan with a link to:
                "Which of These Disgusting Chuck Johnson Rumors
                Are True?" 12/15/2014

4.              Tweet written by Taylor Berman with a link to:
                "Which of These Disgusting Chuck Johnson Rumors
                Are True?" 12/15/2014

5.              Tweet written by Adam Weinstein with a link to:
                "Wait Did Clowntroll Blogger Chuck Johnson Shit
                On The Floor One Time?" 12/9/2014

6.              Tweet written by Adam Weinstein saying "when chuck
                Johnson poops on your floor allegedly"
                [Sad kitten picture]. 4/8/2015

7.              Tweet written by Adam Weinstein with a link to:
                "Which of These Disgusting Chuck Johnson Rumors
                Are True?" 12/15/2014

8.              Tweet written by Gawker with a link to:
                "The Daily Caller Can't Quit Chuck Johnson"
                12/9/2014

9.              Tweet written by Gawker with a link to:
                "What is Chuck Johnson, and Why? The Web's
                Worst Journalist Explained" 12/9/2014

10.             Tweet written by Gawker with a link to:
                "Which of These Disgusting Chuck Johnson Rumors
                Are True?" 12/15/2014

11.             Tweet written by Gawker with a link to:
                "What is Chuck Johnson, and Why? The Web's
                Worst Journalist Explained" 5/24/2015

12.                        Tweet written by Gawker with a link to:
"Which of These Disgusting Chuck Johnson Rumors Are True?" 6/8/2015

13.                        "Which of These Disgusting Chuck Johnson Rumors Are True?" by J.K. Trotter 12/15/2014

14.                        "Wait, Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?" by Greg Howard 12/9/2014

15.                        "What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained" by J.K. Trotter 12/9/2014

16.                        "The Daily Caller Can't Quit Chuck Johnson" by J.K. Trotter 12/9/2014

17.                        Comments from, "Wait Did Clowntroll Blogger Chuck Johnson Shit On The Floor One Time?" 12/9/2014

18.                        Cmcalumna Kinja Comment History

19.                        Comments from, "What is Chuck Johnson, and Why? The Web's Worst Journalist, Explained" 12/9/2014

20.                        Comments from, "Which of These Disgusting Chuck Johnson Rumors are True?" 12/15/2014

21.                        J.K. Trotter discussion with fellow commenter, "TheOneWhoKnocks" 12/15/2014

22.                        J.K. Trotter discussion with fellow commenter, "m" 12/15/2014

23.                        J.K. Trotter discussion with fellow commenter, "Russianist" 12/15/2014

24.                        J.K. Trotter discussion with fellow commenter, "ihatepickinggames" 12/15/2014

25.                        J.K. Trotter discussion with fellow commenter, "cassienyc" 12/15/2014

26.                        J.K. Trotter discussion with fellow commenter, "Josh Wolf" 12/15/2014

27.             J.K. Trotter discussion with fellow commenter,
                "yankeeinchucktown" 12/15/2014

28.             Comment made by "hiphoptimusprime" to
                J.K. Trotter 12/15/2014

29.             Tweet written by Greg Howard with a link to:
                "Wait, Did Clowntroll Blogger Chuck Johnson
                Shit On The Floor One Time?" 12/9/2014

30.             "GotNews" comments at Cmcaluma 12/9/2014

31.             Cmcalumna defecation allegations against
                Mr. Johnson, directed to Greg Howard 12/9/2014

32.             More Cmcalumna defecation allegations against
                Mr. Johnson, directed to J.K. Trotter 12/9/2014

33.             Jordan Sargent comment to Greg Howard
                12/9/2014

34.             Greg Howard post stating, "There is some good-ass
                Kinja to be had" linking to his defamatory article
                12/9/2014

35.             Statement of Charles C. Johnson 10/15/2015

36.             Recent Tweet written by Greg Howard once again
                Implying Mr. Johnson defecated on the floor in college.
                6/18/2015

37.             Facebook Post written by Mr. Johnson 12/9/2014

38.             Email conversation between Mr. Johnson and
                Mr. Trotter 12/12/2014

39.             Email conversation between Mr. Johnson and
                Mr. Howard 12/9/2014-12/12/2014

40.             Charles Barkley article written by Mr. Howard
                12/4/2014

41.             Budweiser advertisement from Gawker website,
                Demonstrating their St. Louis targeted advertising

42.            Table of Defamatory Statements