IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
(Eastern Division)

| | | |
|---|---|---|
| CHARLES JOHNSON and | : | |
| GOT NEWS, LLC | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 4:15-cv-001137 |
| v. | : | |
| | : | |
| GAWKER MEDIA, LLC, J.K. TROTTER, | : | |
| and GREG HOWARD | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

COME NOW Plaintiffs Charles C. Johnson and GotNews, LLC, by and through their undersigned attorneys, and for their Memorandum in Opposition to Defendants' Gawker Media, LLC, J.K. Trotter, and Greg Howard (collectively, "Defendants") Motion to Dismiss Plaintiffs' Complaint, state as follows:

**I.      THIS COURT HAS SPECIFIC JURISDICTION OVER DEFENDANTS**

To establish specific jurisdiction, a plaintiff must demonstrate that both (1) "a defendant's conduct was covered by the [Missouri] long-arm statute" and (2) "the exercise of jurisdiction comports with due process requirements." *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 909 (8th Cir. 2012) (citation omitted). Plaintiffs meet both requirements.

Missouri's long-arm statute permits jurisdiction where the cause of action arises out of the defendant's "transaction of any business within this state" or the "commission of tortious act within this state." Mo. Ann. Stat. § 506.500(1), (3). The 8th Circuit Court of Appeals has held that the proper test for determining specific jurisdiction when the defendant operates an "interactive website" is the Zippo "sliding scale" model. Under the Zippo approach, Courts use a

sliding scale to determine where a defendant or its website falls along a spectrum between doing business over the internet on the one hand versus merely posting information accessible to foreign jurisdictions.

Gawker's and its subsidiaries' websites follow similar models, and when examining them closely, they fall unequivocally on the "interactive" side of the Zippo spectrum. These are by no means "passive" sites. They are built on and their business model relies upon **<u>interaction</u>** with readers in various foreign jurisdictions. Readers who wish to create content are able to create logins with passwords so they may create discussion posts on articles posted by Gawker and its subsidiaries. *See* Plaintiffs' Amended Complaint. Not only this, but unpaid content creators are highly encouraged to create blog websites of their own, and to collaborate with paid content creators to produce content on Gawker's own commercial websites (thus earning Gawker readers and revenue in the process). Plaintiffs also stipulate they have alleged that Defendants committed torts against Plaintiffs in the state of Missouri.

## A.    DEFENDANTS' CASES ARE NOT ANALOGOUS.

Defendants cases are easily distinguishable from the case at bar. First, *Johnson Chiropractic Ctr., LLC v. Clark,* 2014 WL 3818191 (E.D. mo. Aug. 1, 2014) is distinguishable factually. In that case, the defendant's website sold a video containing allegedly defamatory content. The court found that sufficient business transactions with the forum state were lacking because there were so few. Here, Defendants have established business transactions with Missouri businesses and customers by specifically directing advertising based on intricate demographic data allowing custom-tailored advertising, to its million-plus Missouri readers.

Defendants argue that due process would not permit specific jurisdiction even if the long-arm statute applies. Defendants cite to *Steinbuch v. Cutler*, an 8th Circuit Case addressing

2

whether a bookseller was subject to specific jurisdiction in Arkansas and denied personal jurisdiction finding that plaintiff had "not shown enough specifics about the quality and quantity of [defendant's] contacts." *Steinbuch v. Cutler,* 518 F.3d 580, 588 (8th Cir. 2008). Plaintiffs are prepared to demonstrate that the quality and quantity of Defendants contacts in Missouri warrant jurisdiction.

A court will find personal jurisdiction where a defendant "purposely availed itself of the privilege of conducting business in the state and should therefore have reasonably anticipated being haled into court." *Id.* at 587. In *Steinbuch,* the plaintiff had not shown that defendant publisher purposefully availed itself because there was uncertainty as to the depth of the publisher's involvement in advertising plaintiff's book in Arkansas, and the 8th Circuit remanded the case to allow plaintiff to elicit whether the contacts were sufficient through **tailored discovery.** *Id.* at 589. The 8th Circuit also noted that the trial court in *Steinbuch* emphasized the relatively small number of sales in Arkansas and the lack of substantial advertising campaign in that state. Here, the number of readers and revenue generated through advertising to Missouri readers is much more significant. Quantcast demographic data collected for Gawker media shows that Defendants have over **one million unique Missouri readers**.

### B.   DEFENDANTS HAVE INTENTIONALLY DIRECTED DEFAMATORY CONTENT AT MISSOURI RESIDENTS.

Defendants availed themselves of the laws of the State of Missouri by: 1) directing articles, content, and advertising specifically at Missouri residents, 2) communicating with Missouri residents through Twitter and Kinja, 3) targeting Plaintiffs with defamatory articles for the purpose of destroying Plaintiffs' business and discrediting Plaintiffs in the state of Missouri and

among its residents, and 4) by actually causing harm to Plaintiffs' reputation in the state of Missouri among its residents.

Gawker regularly engages in strategic "clickbaiting"[1] in order to target particular geographical jurisdiction audiences, specifically in the state of Missouri. For example, deliberately insulting St. Louis Cardinals' fans in order to get their attention - and eyeballs - on the webpage - and advertisers. See, e.g., Ex. 41, Plaintiffs' Amended Complaint. Gawker maintains technology which allows it to track key consumer demographics based primarily upon geographic location, in order to microtarget marketing on a consumer-by-consumer basis.

Second, Gawker as well as Gawker paid content creators (e.g., Trotter and Howard) maintain social media accounts, including Twitter accounts, which are read and "followed" by Missouri readers. Gawker as well as Gawker paid content creators often have thousands or tens of thousands (Gawker has in excess of 576,000) of Twitter followers - that is, individual content consumers. Gawker, and paid content creators Greg Howard, J.K. Trotter, Anna Merlan, and Erin Gloria Ryan –among others- all have Twitter followers *who reside in the State of Missouri*. Gawker, Howard, Trotter, Merlan, and Ryan also published (or, "tweeted") to all of their followers, defamatory statements about Johnson and advertised hyperlinks to defamatory articles written about Johnson between December 9, 2014 and December 15, 2014. See, e.g., Ex. 1-9 of Plaintiffs' Amended Complaint. In so doing, they each evidenced an intent to engage in business in the State of Missouri and also to specifically transmit the defamation to Missouri to a Missouri audience.

---

[1] **From Oxford Dictionaries- noun,** *informal:*
(On the Internet) content whose main purpose is to attract attention and encourage visitors to click on a link to a particular web page.
http://www.oxforddictionaries.com/us/definition/american_english/clickbait

Third, without having access to discovery on the number of pageviews Defendants have record of, but having seen the Quantcast demographic data which shows there are over **one million unique Missouri users**, Plaintiffs are extremely confident that Defendants' defamatory articles received far more than 25 pageviews from Missouri residents. *See Baldwin v. Fischer-Smith*, 315 S.W.3d 389 (Mo. App. 2010) (defamatory comments published and accessed by at least 25 Missouri residents).

Fourth, the most demonstrative case is *Keeton v. Hustler Magazine, Inc.* There, a New York plaintiff sued an Ohio-based corporation for libel in the United States District Court for New Hampshire. *Hustler Magazine, Inc.*, 465 U.S. 770, 771 (1984). The Supreme Court reversed the First Circuit's dismissal for lack of personal jurisdiction, finding that defendant Hustler Magazine had established minimum contacts with the forum state by circulating its magazines throughout the state. *Id.* at 773-74. The Court was not persuaded by defendants' argument that the plaintiff had almost no contacts with the forum state in *Keeton*, stating, "we have not to date required a plaintiff to have 'minimum contacts' with the forum State before permitting that state to assert personal jurisdiction over a nonresident defendant. On the contrary, we have upheld the assertion of jurisdiction where such contacts **were entirely lacking**." *Id.* at 800 (emphasis added).

The Court in *Keeton* determined that the respondent Hustler had sufficient minimum contacts in New Hampshire, because "[r]espondent's regular circulation of magazines in the forum state [was] sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine." *Id.* at 773-74.

Here, Gawker Media, Trotter, and Howard, have circulated defamatory articles and Tweets throughout the state of Missouri, have cultivated Missouri readers on an ongoing basis

5

for many years, and have profited from the contributions and web traffic of Missourians. Indeed, Plaintiffs have alleged that they suffered damages in Missouri, and thus, the State of Missouri has an "especial interest in exercising judicial jurisdiction over those who commit torts within its territory. This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tort-feasor shall be liable for damages which are the proximate result of his tort." *Id.* at 776. Elaborating further, the court stated, "this interest extends to libel actions brought by nonresidents. False statements of fact harm **both the subject of the falsehood and the readers of the statement.** New Hampshire may rightly employ its libel laws to discourage the deception of its citizens." *Id.* Well, Missouri has that same interest here.

Defendants argue that the much of the harm in this case arose outside of Missouri. The *Keeton* court addressed that issue and found it unpersuasive, stating "It is undoubtedly true that the bulk of the harm done to petitioner occurred outside New Hampshire. But that will be true in almost every libel action brought somewhere other than the plaintiff's domicile. There is no justification for restricting libel actions to the plaintiff's home forum. The victim of a libel, like the victim of any other tort, may choose to bring suit in any forum in which the defendant has 'certain minimum contacts…' such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 780. There is no meaningful difference between Defendants in this action and Hustler Magazine in the *Keeton* case, other than the rise of the internet age, where instead of physically shipping magazines to citizens, Defendants enter our states and our homes through internet publication, tweeting, and interacting with Missouri readers online.

For the foregoing reasons, this Court can exercise personal jurisdiction over Defendants in this matter. Thus, Defendants' Motion to Dismiss should be denied.

## II.      THIS COURT HAS GENERAL JURISDICTION OVER DEFENDANTS

"General jurisdiction may be exercised if a defendant has maintained systematic and continuous presence in a forum state such that it has purposefully availed itself of the privileges of a particular state's laws to the point where exercising jurisdiction does not offend the traditional notions of fair play or substantial justice. *Arnold v. AT&T, Inc.*, 874 F. Supp. 2d 825, 831 (E.D.Mo. 2012) (specific phrases such as, "Defendants regularly, actively, knowingly, and continuously conduct business in Missouri," and that alleged internet activity "documents their regular, active, knowing, and continuous business within the state of Missouri," are indicative of an assertion of general jurisdiction).

Defendants craft articles targeting readers based upon demographic data. In this way, Defendants have had an ongoing and continuous presence in Missouri, as they have catered to over one million unique Missouri readers. Not only that, Defendants utilize tracking software to track the location of its readers and then populates its webpages with advertising tailored to those readers based on location and other collected data. For example, Plaintiff's counsel accessed gawker.com from a St. Louis, Missouri address and the page contained an ad for St. Louis Budweiser Brewery Tours. *See* e.g., Ex. 41, Plaintiff's Amended Complaint.

Because of Defendants' data harvesting, because Defendants use that data to inform their contributors and advertisers, and for the same reasons as those Plaintiff made in support of a finding of personal jurisdiction, Defendants' conduct business within the State of Missouri regularly, actively, knowingly, and on an ongoing basis. To suggest that Gawker did not intend to enter this forum is to also suggest Gawker would be perfectly content to lose this forum's one

7

million monthly readers and attendant advertising revenue. For the reasons stated above, this Court has general jurisdiction over Defendants.

## III.     PLAINTIFFS HAVE PROPERLY STATED CLAIMS FOR DEFAMATION

### A.     Plaintiff Is A Limited Public Figure In Some Contexts; A Private Figure In Others

The law currently recognizes a distinction between "all purpose public figures," "limited purpose public figures," and "private figure." *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

In *Gertz*, the Court explained, "those who have attained [public figure status] have assumed roles of prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures ***for all purposes***. More commonly, those classed as public figures have thrust themselves to the forefront of particular controversies in order to influence the resolution of the issues involved." *Id*. (emphasis added). In either event, they invite attention and comment. *Id*. All purpose public figures have extremely powerful access to communication channels to ***effectively*** defend their reputations. Limited purpose public figures have less. Private persons have very little. *Id*. Public figures can be said to have "voluntarily exposed themselves to increased risk of injury from defamatory falsehoods. No such assumption is justified with respect to private individuals." *Id*.

The California Supreme Court, for example, has held that a single interview with the "Bakersfield television station," as compared with defamation in a newspaper with a circulation of 2.5 million, is ineffective and contributes to finding an individual to be a "private person." *Khawar v. Globe Internat.*, 19 Cal. 4th 254, 965 P.2d 696, 79 Cal. Rptr. 2d 178, 1998 Cal. LEXIS 6880, 98 Cal. (Cal. 1998). Similarly, one who comments about defamatory statements in

a bid to diffuse them or defend one's reputation, does not make the individual a voluntary public figure. *Id*.; see also *Cockram v. Genesco, Inc*., 680 F.3d 1046 (8th Cir. Mo. 2012).

However, the scope of the risk of injury is congruent with the type and kind of "voluntary exposure." An expert in, and outspoken advocate of plastic surgery was found to be a limited public figure, such that statements alleging that his surgical techniques resulted in disfigurement were entitled to constitutional protection. *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 53 Cal. Rptr. 3d 752, 2007 Cal. App. LEXIS 107 (Cal. App. 3d Dist. 2007)("A person becomes a limited public figure by injecting himself into the public debate about a topic that concerns a substantial number of people. Once he places himself in the spotlight on a topic of public interest, **his private words and conduct <u>relating to that topic</u> become fair game**")(emphasis added).

Furthermore, the US Supreme Court has described a defamation equitable estoppel rule. "[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111 (1979); *Khawar v. Globe Internat.*, 19 Cal. 4th 254, 965 P.2d 696, 79 Cal. Rptr. 2d 178, 1998 Cal. LEXIS 6880, 98 Cal. (Cal. 1998); *Brown v. Kelly Broadcasting Co*., 48 Cal. 3d 711, 771 P.2d 406, 257 Cal. Rptr. 708 (Cal. 1989). Plaintiffs note that it was Defendants who published defamatory statements about Plaintiffs, and that it was Defendant Howard who first reached out to Plaintiff Johnson regarding the rumors of public defecation and bestiality. Plaintiff Johnson responded to Howard for the purpose of diffusing the situation and defending his reputation by denying the rumors. Yet Defendants argue that Plaintiffs actions make him a public figure. Thus, the equitable estoppel rule applies.

**B.    Johnson Is a Limited Public Figure for Limited Number of Purposes**

As a scrappy young reporter trying to establish a brand in a very competitive industry, Johnson may be a limited public figure for the purposes of his career - a journalist. However, he is a limited public figure for the purposes of every news story he has published which has either entered into pre-existing controversy or independently generated controversy. For example, as discussed *supra*, Johnson has published many articles about the Ferguson Riots. He is therefore a limited public figure as to *that topic area.*

However, prior to Defendants conspiring to manufacture disgusting rumors about him, which are provably false, Johnson was never a public figure for purposes of the topical areas of public defecation and bestiality. As a result, as to all defamatory comments relating to public defecation and bestiality, Johnson is a **private** figure. And this is established in other ways.

As *Gertz* made clear, the all purpose/limited purpose public figure distinction focuses on the relative power the individual has to command media, as well as whether or not the individual voluntarily entered the arena of public controversy.

Prior to Defendants' defamation, rumors of bestiality were non-existent. But subsequent to Defendants' acts, rumors of Johnson publicly defecating and of bestiality were ubiquitous across the internet. Johnson *did not voluntarily enter the controversy*. Rather, in an effort to preempt both Howard and Trotter, Johnson, mistakenly believing that Gawker, Howard, or Trotter cared about truth in reporting, thought that by confirming in an email to Howard (at 2:14 p.m.) that the accusation was **false**, this would prevent any further defamatory content from being published on Gawker.

When a massive media establishment has obviously set-out to defame and humiliate you regarding **manufactured** matters supposedly from your personal life and childhood, what options does one have to attempt to defend one's reputation? See *Khawar v. Globe Internat.*, 19

10

Cal. 4th 254, 965 P.2d 696; *Cockram v. Genesco*, *Inc.*, 680 F.3d 1046 (8th Cir. Mo. 2012).

Attempting to preemptively diffuse an article is probably the best option Johnson had to try and

defend his reputation against Defendants' defamation. If this act signifies that he "voluntarily

entered the controversy," then the only legal option anyone has when posed with such a situation

is simply to remain as a sitting duck. Legally enforced victimhood. In fact, from a damages

standpoint, it could be argued that Johnson had a duty to mitigate his damages in the best way he

knew how.

   **C. As to defamatory statements A, B, and N in Plaintiff's Exhibit 42, Plaintiff has properly alleged that Defendants published those statements with actual malice.**

   Defendants argue that Plaintiffs have failed to plausibly allege "actual malice." Public or

Limited Public figures are required to plead "actual malice," meaning that a challenged statement

was made "with knowledge that it was false or with reckless disregard of whether it was false or

not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). As to defamatory statements

which accuse Plaintiffs of getting caught lying in their reporting, and that Plaintiffs fabricated

stories (*See* statements A, B, and N of Exhibit 42, Plaintiffs' Amended Complaint), Plaintiff

Johnson is a Limited Public Figure under Missouri Law, and therefore to make a claim for

defamation, Plaintiffs must plead "actual malice." Plaintiffs' have done so.

   Defendants cannot demonstrate a lack of knowledge as to the truth or falsity of specific

statements they made about Plaintiff Johnson referred to within Plaintiffs' Complaint. *See Id*.

For example, Defendant Trotter states that Plaintiff Johnson "erroneously report[ed] that former

Newark Mayor Cory Booker didn't actually reside in Newark." That statement is false, and it is

verifiable. Howard hyper-linked the statement to an article from Buzzfeed. That article states

that, according to Booker himself, among others, he does live in Newark, but provides no

11

explicit and unequivocal evidence as to that fact. The article itself does not demonstrate that

Plaintiff Johnson's reporting of the issue was "erroneous." Nor does Defendant Howard attempt

to clarify exactly what about Johnson's reporting was erroneous, which would have

demonstrated neutral reporting. Instead, Howard makes a bald, patently false statement harmful

to Plaintiffs' business.

The 8th Circuit has stated that when analyzing "actual malice," it will focus on "the

defendant's attitude toward the truth of the statements," and that the privilege "does not protect

one who 'in fact espouses or concurs in the charges made by others, or who deliberately distorts

these statements to launch a personal attack of his own on a public figure." *Price v. Viking

Penguin*, 881 F.2d 1426 at 1434 (internal citations omitted). In reaching its holdings, *Price* relied

heavily upon *Edwards v. National Audubon Society, Inc.*, 556 F. 2d 113 (2d Cir. N.Y. 1977).

Additional key requirements described by *Edwards* were that the trustworthiness of the *source*

be **manifest**, and that the topic area or subject matter be "serious."

Actual malice can be shown as to Trotter's accusation that the Daily Caller's story about

New Jersey Senator Bob Menendez allegedly soliciting prostitutes in the Dominican Republic

"turned out to be a complete fabrication." *See* statement C, Ex. 41, Plaintiffs' Amended

Complaint. These allegations have been corroborated and proven true. See Plaintiffs' Amended

Complaint. The subjective actual malice standard can be a slippery slope that would allow

Trotter to say that he subjectively believed the story was made up. However, that subjective

belief cannot be the basis of a reporting of a defamatory fact, with nothing else to suggest its

truth.

Finally, the allegation that Johnson, "has been caught lying several times before," was

published with "actual malice." *See* statement A, Ex. 41, Plaintiffs' Amended Complaint. That is

a verifiable fact, but how is a reader supposed to know it is, as Defendants' argue, Howard's opinion? Further, if true, such a factnwould be positively damning to a journalist or news company. Howard did not elaborate, so it is difficult for Plaintiffs to anticipate what "lies" he was referring to. Suggesting a football coach has been "caught cheating several times," would be similarly defamatory if untrue. Howard cannot claim that this fact was "reported" neutrally, since he does not flesh out the allegation, cite to evidence, or link to other articles so that the reader can determine for herself whether the charge was true. Both Trotter and Howard selectively republished false statements and reported incomplete, personal takes on Johnson's reporting and on the rumors about Johnson. For the same reasons this selective highlighting precludes them from immunity under CDA 230, *infra*, Trotter, Howard, and Gawker cannot establish that they published defamatory statements fairly and neutrally. Johnson has never lied in his reporting, nor has he been "caught lying." *See* Ex. 35, Plaintiffs' Amended Complaint.

Plaintiffs are not public figures with respect to the defamatory statements alleged in the Complaint which refer not to Plaintiffs' journalism, but which charge Plaintiff with public defecation and bestiality. *See* statements C-AL excluding N of Ex. 42, Amended Complaint. Plaintiff Johnson clearly and unequivocally communicated to Defendant Howard that those particular rumors were false. *See* Ex. 39, Amended Complaint. Despite Johnson's denial of the absurd and disgusting rumors, Howard published them anyway, suggested that they were true, and deliberately misrepresented and selectively quoted from the statements of the anonymous contributors who were his "sources." Specifically, Howard failed to mention in his article that the first quoted anonymous source in that article, *Cmcalumna*, recanted her statement that Johnson publicly defecated in school. *See* Ex. 18, Amended Complaint.

**D.    The Defamatory Statements Are Actionable.**

13

Defendants' argue that the statements Plaintiffs have alleged are not actionable. They argue that the statements were opinion and not fact, that the statements were neutrally reported, and that, given the context of the statements, they did not assert facts about Plaintiffs, but, rather, that they were simply poking fun at Plaintiffs' expense. Rather than restating arguments already made by Plaintiffs in their argument for "actual malice" *supra*, Plaintiffs incorporate by reference, the arguments regarding the factual nature of the articles and statements as if fully stated in this section. Plaintiffs also restate and incorporate by reference their arguments precluding Defendants from CDA 230 immunity, *infra*.

### E. Defendants Have Deliberately Prevented Plaintiffs From Recovering From Certain Anonymous Content Creators

Part of Gawker's strategy of publishing private, salacious, sensational and scandalous material online - without any care as to the legitimacy of it - is to incite anonymous content creators on their websites to publish defamatory content.

As described above, Gawker has purposefully created and/or appropriated different tools, such as "burner accounts" and Gawker "SafeDrop" in order to protect their anonymous sources from "third party" investigations which could establish the identity of the defaming anonymous content creators and tipsters. By Gawker's own admission, Gawker does not keep any data on holders of "burner accounts," and in fact purposefully deletes any information it temporarily has, all to permit defaming anonymous content creators to circumvent defamation liability. Gawker has a vested interest in continuing to do this, because it earns Gawker revenue. *See* Amended Complaint.

Trotter admitted that anonymous content creator *Cmcalumna* and *ChekhovsGum(ItsGonnaPop!)* were both anonymous content creators who had kinja profiles

14

using "burner accounts." Given that Trotter wrote Gawker's "how-to" article on how to circumvent defamation liability, Trotter knows very well that this means Gawker can't know the identity of the content creators - by design. Trotter also knows that he can quote these content creators without fear, because no one will ever be able to find them.

The First Amendment cannot be used as a sword and a shield. *Dalitz v. Penthouse Int'l,* 168 Cal. App. 3d 468, 2nd District Court of Appeal (1985); Garland v. Torre, 259 F.2d 545, 2nd Circuit Court of Appeals. Yet, this is precisely what Defendants are attempting to do. Furthermore, they have alleged Communications Decency Act Section 230 immunity. Because they have deliberately and maliciously by design sought to circumvent defamation liability, effectively denying Plaintiffs of all chance of recovering from *ChekhovsGum(ItsGonnaPop!)* or *Cmcalumna.*

### F.     Defendants Are Not Immune Under CDA 230(C)1.

230 bars a claim if (1) the defendant asserting immunity is an interactive computer service provider, (2) the particular information at issue was provide by another information content provider, and (3) the claim seeks to treat the defendant as a publisher or speaker of that information. By contrast, a defendant is not entitled to protection from claims based on the publication of information if the defendant is "responsible, in whole or in part, for the creation or development of [the] information." 47 U.S.C. 230(f)(3).

As to the charges made by Trotter and Howard that Plaintiffs' erroneously reported on the Booker incident, got "caught lying several times," and "fabricated" the Menendez scandal, Trotter and Howard were information content providers. *See* statements A, B, and N in Ex. 42, Amended Petition. They were first parties responsible for authoring the defamatory content. CDA 230(c)1 immunity does not apply to them as to those statements.

15

As to statements C-AL excluding N in Ex 42 of the Amended Petition, CDA 230 immunity should be precluded because Defendants materially contributed to the underlying illegal statements. As the Court stated in *Jones v. Dirty World Entm't Recordings, LLC*, "230(c)1's grant of immunity is not without limits, however. It applies only to the extent that an interactive computer service provider is **not** also the information content provider for the content at issue." An 'information content provider' is defined as 'any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service.' A website operator can simultaneously act as both a service provider and a content provider. If a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content—and is not immune from claims predicated on it." *Jones v. Dirty World Entm't Recordings, LLC*, 755 F.3d 398, 408 (6th Cir. 2014).

Defendants materially contributed to the defamatory statements by 1) republishing them, 2) interacting with anonymous content providers and encouraging them to provide more information, 3) setting up a system whereby people may anonymously contribute to the website to avoid liability for defamation, 4) by drafting multiple articles and generating salacious headlines about the rumors, and 5) by selectively quoting from the anonymous content providers who were the "sources" of the defamatory material. Defendants were more than mere service providers allowing anonymous posters a forum for discourse. Rather, Defendants actively and deliberately published the rumors. Cultivating and republishing the offensive postings were their "raison d'etre," as it were. *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1200 (10th Cir. 2009).

This case is similar to *General Steel Domestic Sales, LLC v. Chumley*. There, the question presented was whether posts on a blog hosted by defendant and curated by defendant

16

which included defamatory content injurious to plaintiff's business were "developed" by

defendants, or whether defendants simply republished information on the internet from third

parties which contained defamatory content about the plaintiff. *General Steel Domestic Sales,*

*LLC v. Chumley*, 2015 U.S. Dist. LEXIS 108789.

  In finding for the plaintiff, the court noted that some of the quotations on defendants'

IRLM Page included separate, non-consecutive portions of the document quoted. *Id.* at 21. In

addition, the court noted that defendant wrote the summary descriptions contained in some of the

posts, and he chose the excerpts which were quoted in each post. *Id.* at 22. The court found that

CDA 230(c)1 did not provide immunity to defendants, stating:

> "To the extent the defendants **chose** certain **summaries** and
> quotations describing the referenced court proceedings, **failed to
> accurately describe the proceedings as a whole**, and posted those
> quotations and summaries on the IRLM Page, the defendants
> **developed** the information they posted on that page. These
> editorial choices can be seen as a choice to emphasize unflattering
> allegations made against General Steel without summarizing or
> quoting information which reflects the nature and outcome of the
> court proceeding described. The claims of General Steel are
> founded on its contention that the defendants created an inaccurate
> image of General Steel by highlighting on the IRLM Page
> unflattering allegations against General Steel without also
> describing the context of those claims or how those claims were
> resolved. **Highlighting the unflattering allegations without
> providing other relevant information reasonably can be seen as
> contributing to the allegedly defamatory or otherwise
> actionable nature of the underlying information. Such actions
> specifically encourage development of what is allegedly
> unlawful or legally actionable about the content and, thus,
> constitutes development of the information for the purpose of
> 230 immunity…** As to these posts, the defendants are information
> content providers under 230 who are not entitled to 230
> immunity."

*Id.* at 22-23.

Similarly, here, a comparison between the anonymous content providers' original posts and the articles published by Gawker and authored by Trotter and Howard will show that Defendants developed the information by highlighting the more outrageous and sensational allegations unfairly and selectively. There, as here, defendants materially contributed to the underlying defamatory content, not only by selectively quoting from anonymous content providers, but also by summarizing those providers' contributions, failing to accurately describe the charges against Plaintiffs, and highlighting unlawful defamatory information about Plaintiffs in order to harm Plaintiffs' business. Trotter's and Howard's articles are not simply republishing contributions from anonymous contributors. Rather, Trotter and Howard *developed* the charges and published their own thoughts, as well as summarized the information in their own words, all for the purpose of harming Plaintiffs' business. Defendants are not precluded from liability by CDA 230. Thus, the Court should deny their Motion to Dismiss.

CDA 230 is not a universal shield against all claims. 47 U.S.C.S. § 230 of the Communications Decency Act of 1996 (CDA) provides immunity only if the interactive computer service does not create or develop the information "in whole or in part." 47 U.S.C.S. § 230(f)(3) *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1161 (9th Cir. Cal. 2008). Further, if a website helps to develop unlawful content, it falls within the exception to 47 U.S.C.S. § 230, if it contributes materially to the alleged illegality of the conduct. *Id.* In Roommates, the 9th Circuit held that the CDA does not provide immunity to websites which induce third parties to express illegal preferences. *Id.* at 1165. The court explained: "The CDA does not grant immunity for inducing third parties to express illegal preferences. Roommate's own acts--posting the questionnaire and requiring answers to it--are entirely its doing and thus section 230 of the CDA does not apply to them. Roommate is entitled to **no immunity**." *Id.* In

18

other words, in that case, Roommates was using CDA 230 to shield it from liability for

facilitating the breaking of California law. Here, Gawker - **by it's own doing, and not by a**

**third party** - provides anonymous unpaid content creators and tipsters the tools to *completely*

*circumvent any defamation liability*, and thereby depriving Plaintiffs of their 14th Amendment

property interest in their legal claim. *Zinermon v. Burch*. 494 U.S. 113 (1990).

Additionally, in *Barrett v. Rosenthal*, the California Supreme Court noted that CDA §

230 immunity was appropriate in part because plaintiffs had **alternative recourse** to sue the

originator of the defamatory Internet publication. *Barrett v. Rosenthal*, 40 C.4th 33, 62 (Cal.

2006). *See also,* concurrence at 63 (suggesting that an internet publisher who conspires with the

author of a defamatory statement would not be immune under the statute).

But of course, Plaintiffs also question whether or not unpaid content creators are actually

third parties. Payment certainly is an issue. But courts across the country have repeatedly held

that unpaid internships are permissible, so long as the intern gets valuable experience. Here,

Gawker monitors all Kinja content creators[2] - paid and unpaid - in a gigantic audition network.

Those unpaid blogs which do well are scooped up by Denton and Gawker; those unpaid content

creators are sometimes offered jobs or contracts.

## IV.    PLAINTIFFS HAVE PROPERLY STATED CLAIMS FOR INJURIOUS FALSEHOOD

*Cuba's Ready Mix v. Brock Concrete Foundations, Inc*., provides that "Missouri courts

have recognized this tort as stated in the Restatement (Second) of Torts, § 623A, which states:

One who publishes a false statement harmful to the interests of another is subject to liability for

pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in

---

[2] See <u>Plaintiffs' Amended Petition.</u>

harm to interests of the other having a pecuniary value, or either recognizes or should recognize

that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard

of its truth or falsity."*Cuba's United Ready Mix, Inc. v. Bock Concrete Foundations, Inc.*, 785

S.W.2d 649, 651, (Mo. Ct. App. 1990).

Plaintiffs have within their petition properly alleged the elements of a trade libel or

injurious falsehood claim in accordance with Missouri law. Plaintiffs have alleged and have

provided facts supporting their allegation that Defendants intentionally published defamatory

statements about Plaintiffs with the desired result of harming Plaintiffs' business and that

Defendants knew the statements were false or acted in reckless disregard for their truth or falsity.

For similar reasons as those stated in Plaintiffs' Defamation argument, Plaintiffs have also

properly asserted claims for injurious falsehood under Missouri Law. Therefore, Plaintiffs'

claims for injurious falsehood should not be dismissed.

## V.   PLAINTIFFS HAVE PROPERLY STATED CLAIMS FOR INVASION OF PRIVACY

The tort of invasion of privacy is a cognizable legal claim in the state of Missouri which

was recognized by the Eastern District of Missouri in *Meyerkord v. Zipatoni Co.*, 276 S.W.3d

319, 324-25 (Mo.App. E.D. 2008), *See, also, Sullivan v. Pulitzer Broadcasting Co.*, 709 S.W.2d

475 (Mo. banc 1986).

Therefore, Defendants have failed to show that the tort of invasion of privacy is not a

cause of action in the Eastern District of Missouri. For that reason, this Court should deny

Defendants' Motion to Dismiss as to Plaintiffs' claim for false light invasion of privacy.

## VI.   IN THE ALTERNATIVE, PLAINTIFF REQUESTS THE COURT TO APPLY CALIFORNIA LAW.

### Conclusion

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' Motion to Dismiss and Motion to Strike or Dismiss Pursuant to the California Anti-SLAPP Law. Alternatively, should the Court find in favor of Defendants, Plaintiffs pray that this Court grant them leave to file an amended complaint, that the court stay its determination as to Defendants' Anti-SLAPP motion pending discovery, and that the Court, should it find jurisdiction lacking, transfer the case to a Federal District Court in California, and any other relief this Court deems just and proper.

Respectfully submitted,

**THE BURNS LAW FIRM, LLC**

 /s/ John C. Burns
John C. Burns #66462MO
1717 Park Avenue
St. Louis, MO 63104
Phone: (314) 339-8388
Fax:    (314) 932-2171
john@burns-law-firm.com
*Attorney for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was served, via the Court's electronic notification system, on October 22, 2015, upon all parties of record.

 /s/ John C. Burns