IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
(Eastern Division)

| | | |
|---|---|---|
| CHARLES JOHNSON and | : | |
| GOT NEWS, LLC | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 4:15-cv-001137 |
| v. | : | |
| | : | |
| GAWKER MEDIA, LLC, J.K. TROTTER, | : | |
| and GREG HOWARD | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE (ANTI-SLAPP)**

**I.    DEFENDANT'S CALIFORNIA ANTI-SLAPP MOTION TO STRIKE CANNOT BE PERMITTED IN THIS MATTER.**

**A.    The California Anti-SLAPP Is Precluded By The Seventh Amendment And By The Rules Enabling Act, As It Interferes With Rules 8, 11, 12, and 56 of the Federal Rules of Civil Procedure.** *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.***, 559 U.S. 393 (2010).**

Defendants argue, "The California Anti-SLAPP statute provides a mechanism 'to dismiss meritless lawsuits designed to chill the defendant's free speech rights at the earliest stage of the case.' If an anti-SLAPP motion is successful, the case is dismissed with prejudice and the defendants are awarded their attorneys fees and costs." (Anti-SLAPP, at para. 2). In so stating, Defendants are admitting that the Anti-SLAPP is a **procedural** mechanism designed to test the sufficiency of Plaintiffs' pleadings. Cf., *Hawran v. Hixson*, 147 Cal. Rptr. 3d 88, 4th District Court of Appeal, September 13, 2012 ("A special motion to strike is a procedural remedy").

In *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010), the Supreme Court re-affirmed *Sibbach v. Wilson*, 312 U.S. 1 (1941) and *Hanna v. Plumer*, 380 U.S. 460 (1965) in holding that where a state law conflicts with a Federal Rule of

Procedure, the state law, so long as it is not substantive, but procedural, is preempted by the Rules Enabling Act. The key is a validity test, which looks to the nature of the Federal Rule (and not the nature of the state law). The question is whether or not the Federal Rule is substantive or procedural. If the Federal Rule is procedural, it is valid and will survive a "facial challenge" and thus the *state law* is preempted. See *Unity Healthcare, Inc. v. County of Hennepin*, 2015 U.S. Dist. (Minn.) LEXIS 83246 (Minnesota Anti-SLAPP cannot be applied in Federal Court); See also *Boulter II*, 2012 U.S. Dist. LEXIS 151231, 2012 WL 5245458, at *2 (D.C. Anti-SLAPP cannot be applied *because to do so would violate the Seventh Amendment right to trial by jury*); Clermont, FEDERAL COURTS, PRACTICE & PROCEDURE: THE REPRESSIBLE MYTH OF SHADY GROVE, 86 Notre Dame L. Rev. 987 (2011).

The Federal Rules already provide numerous "mechanisms" to test the sufficiency of Plaintiffs' pleadings. For example, Rule 8. "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in *Twombly*, 550 U.S. 544, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id*., at 555. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id*., at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. **The plausibility**

standard is not akin to a "probability requirement," but it asks for more than a sheer *possibility* that a defendant has acted unlawfully. Ibid. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*., at 557." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009)(emphasis added)(internal citations largely omitted).

The Supreme Court of the United States itself has, as quoted above, said that the pleading standard in Federal Court under Federal Rules is **NOT** *a probability standard*. It is a "**plausibility**" standard. Plausible has been defined as "superficially fair, reasonable, or valuable, but often specious," and "appearing worthy of belief." However, the California Anti-SLAPP statute (C.C.P. Section 425.16(b)(1) specifically states that a plaintiff's lawsuit is subject to strike, "unless the court determines that the plaintiff established that there is a **probability** that the plaintiff *will prevail* on the claim." (emphasis added). Probability has been defined as, "supported by evidence strong enough to establish presumption but not proof," and "likely to be or become true or real."

The Anti-SLAPP creates no substantive rights, it simply  provides a procedural mechanism to vindicate existing rights. Even under California State law, it is something special: it is distinguishable from a motion to dismiss. In addition the fact that plaintiff's suit survives the Anti-SLAPP is inadmissible in evidence later in the suit. And, oddly, it allows a losing defendant the automatic option of interlocutory appeal, against clear U.S. Supreme Court instructions that interlocutory appeals are to granted sparingly. See *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009); *Digital Equip. Corp. v. Desktop Direct, Inc*., 511 U.S. 863, 868 (1994). Thus it is a state law determining Federal Procedure. This, *Shady Grove* tells us, cannot happen.

The Anti-SLAPP enables penalties upon the losing plaintiff of attorneys fees and costs (or losing defendant, if the defendant is shown to have frivolously brought the Anti-SLAPP or done so for the purpose of delay). But this is done in a completely different manner than Fed. R. Civ. P. 11, and thus the California Anti-SLAPP impermissibly interferes with the Federal Rules yet again. See *Estate of C.A. v. Grier*, No. CIV.A. H-10-0531, 2010 WL 4236865, at 6 (S.D. Tex. Oct. 15, 2010); *Garza v. Scott & White Mem'l Hosp*., 234 F.R.D. 617, 622-23 (W.D. Tex. 2005). In the *Garza* case, the court found that a Texas statute, which provided for dismissal of medical malpractice suits and imposition of costs and fees upon plaintiff's failure to file an expert report within 120 days of filing suit, conflicted with the Federal Rules in a number of ways. For one, the statute infringed on a court's discretion to impose sanctions for frivolous claims under Rule 11.

Moreover, Fed. R. Civ. P. 12 tests pleadings for legal sufficiency, and surviving that, the plaintiff can proceed to discovery before having its facts tested at summary judgment, Fed. R. Civ. P. 56. The Anti-SLAPP, on the other hand, halts all discovery and instead requires plaintiffs' facts be tested, even though the plaintiff may have, without the Anti-SLAPP, been able to discover vital facts which could have permitted survival of summary judgment.

For all of these reasons, the California Anti-SLAPP cannot be applied in Federal Court because it impermissibly interferes with the Seventh Amendment and various Federal Rules, in contravention of *Shady Grove* and the Rules Enabling Act.

**B.      The California Anti-SLAPP Is <u>Impracticable</u> As To Defendants Defamatory Statements Relating To Accusations Of Public Defecation and Bestiality; Defendants' Speech Is Not Protected by C.C.P. Section 425.16(e)(3)-(4) (Public Issue or Interest).**

California's Anti-SLAPP law provides heightened procedural protection to a defendant's speech in only four areas. Of those four areas, only two applicable in this matter. The remaining

two require that the defendant's speech be a matter of "public interest," and a defendant must show the statements were made in connection with a public issue or an issue of public interest. *Albanese v. Menounos*, 218 Cal. App. 4th 923, 929 (2013). The statute itself does not define what "public interest" means, but a variety of California cases make very clear that false rumors about Plaintiffs' childhood and private life are not matters of public interest. "A public figure is either [an all purpose public figure] or [one who] has thrust himself to the forefront of a **particular public controversy** in order to influence the resolution of the issues involved." *Gertz*, at p. 345 (emphasis added). For this purpose, a public controversy does not equate with any controversy of interest to the public. *Time, Inc. v. Firestone* (1976) 424 U.S. 448, 454). For example, a divorce action between the scion of one of America's wealthier industrial families and his Palm Beach society wife may have piqued the public's interest but was not a public controversy. *Id*., at p.454; <u>see generally</u>, *Albanese v. Menounos*, 218 Cal. App. 4th at 934 ("where the issue is of interest to only a private group, organization, or community, the protected activity must occur in the context of an ongoing controversy, dispute, or discussion, such that its protection would encourage participation in matters of <u>public significance</u> … It is not enough … that a broad and amorphous public interest can be connected to a specific dispute")(emphasis added)(internal citations omitted); *Weinberg v. Feisel*, (2003) 110 Cal. App. 4th 112, 1132 (2 Cal. Rptr. 3d 385) (collecting a vast swath of Supreme Court and California cases, with analysis):

> "The statute does not provide a definition for "an issue of public interest," and it is doubtful an all-encompassing definition could be provided. However, the statute requires that there be some attributes of the issue which make it one of public, rather than merely private, interest. A few guiding principles may be derived from decisional authorities. First, "public interest" does not equate with mere curiosity. ( *Time, Inc. v. Firestone, supra*, 424 U.S. at pp. 454–455 [47 L. Ed. 2d at p. 163]; *Briscoe v. Reader's Digest Association, Inc*. (1971) 4 Cal.3d 529, 537 [93 Cal. Rptr. 866, 483 P.2d 34].) Second, a matter of public interest

should be something of concern to a substantial number of people. ( *Dun & Bradstreet v. Greenmoss Builders, supra*, 472 U.S. at p. 762 [86 L. Ed. 2d at p. 604].) Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. (Ibid.; *Hutchinson v. Proxmire* (1979) 443 U.S. 111, 135 [61 L. Ed. 2d 411, 431, 99 S. Ct. 2675].) Third, there should be some degree of closeness between the challenged statements and the asserted public interest ( *Connick v. Myers* (1983) 461 U.S. 138, 148–149 [75 L. Ed. 2d 708, 720–721, 103 S. Ct. 1684]); the assertion of a broad and amorphous public interest is not sufficient ( *Hutchinson v. Proxmire, supra*, 443 U.S. at p. 135 [61 L. Ed. 2d at p. 431]). Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort "to gather ammunition for another round of [private]  [1133]  controversy …." ( *Connick v. Myers, supra*, 461 U.S. at p. 148 [75 L. Ed. 2d at p. 721].) Finally, "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." ( *Hutchinson v. Proxmire, supra*, 443 U.S. at p.135 [61 L. Ed. 2d at p. 431].) A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people. ( Ibid.; *Rivero v. American Federation of State, County and Municipal Employees*, *AFL-CIO, supra*, 105 Cal.App.4th at p. 926.).")

*Id*.

As *Albanese* and *Weinberg* make clear, the false, and facially dubious accusations relating to Johnson's personal, private life as well as his childhood, simply cannot be deemed to be speech in the public interest under California law. Prior to Defendants' conspiracy to defame him, neither Johnson's personal history of defecation nor any rumor surrounding alleged bestiality had ever been issues of public interest.

Furthermore, here as in *Connick v. Myers*, 461 U.S. at p. 148, the focus of Defendants' conduct was not the public interest but a private vendetta to "gather ammunition for another round" of private controversy. Moreover, given Defendants' role in creating the controversy, they are *equitably estopped* from citing to the public interest as a defense. *Hutchinson v. Proxmire,* 443 U.S. at p.135. And as a result, Defendants cannot now make use of California's Anti-SLAPP as a shield.

Defendants futilely cite to (and misleadingly quote from) cases which are clearly distinguishable from the present matter. For example: the plaintiff in *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal.App.4th 1027 (2008) was an all purpose public figure of unparalleled status in Finland; plaintiff in *Hall v. Time Warner, Inc*., 153 Cal.App.4th 1337 (2007) was the longtime maid to Marlon Brando who after Brando's death became a limited public figure as a result of the news controversy surrounding Brando's will; in *Sipple v. Foundation for Nat. Progress*, 71 Cal.Appl4th 226 (1999), the defendant magazine broke a story regarding domestic violence allegations against the plaintiff, who was a limited public figure political consultant who was famous for in large part for leveraging domestic violence issues to his clients' advantage. "*Nygard* does not stand for the proposition that any statement about a person in the public eye is a matter of public interest. If we were to adopt [defendant's] overly broad definition of a public issue, we would obliterate the requirement that 'there should be a degree of closeness between the challenged statements and the asserted public interest … Moreover, the focus of the speaker's conduct should be the public interest, not a private controversy." *Albanese* at 936 (internal citations omitted). Simply put, none of these cases are at all analogous to the present case. There is no issue of public interest as to Defendants published writings regarding bestiality and defecation.

## II.   IN THE ALTERNATIVE PLAINTIFFS HAVE SUFFICIENTLY PLED DEFAMATION TO SURVIVE ANTI-SLAPP

### A.   Defamation And Public Figures

In California, defamation is the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injury or which causes special damage. *Gonzalez v. City of McFarland*, 2013 U.S. Dist. LEXIS 72004 Eastern District of California (May 21, 2013);

7

see also *Lee Myles Assocs. Corp. v. Paul Rubke Enters., Inc.*, 557 F. Supp.2d 1134, 1139 (S.D.

Cal. 2008); HN10 Cal. Civil Code 45 ("Libel is a false and unprivileged publication by writing,

printing, picture, effigy, or other fixed representation to the eye, which exposes any person to

hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which

has a tendency to injure him in his occupation").

Plaintiffs have plead that the defamatory statements relating to Johnson as a journalist are

provably false. The statements are per se defamatory, as they allege some of the most repulsive

acts conceivable (bestiality, public exposure/indecency, public defecation) and because they have

directly asserted that Johnson intentionally published false material (e.g., "fabricated" stories,

"proven wrong").

The law currently recognizes a distinction between "all purpose public figures," "limited

purpose public figures," and "private figure." *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 94 S.

Ct. 2997, 41 L. Ed. 2d 789 (1974); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 265 (9th Cir.

2013).

In *Gertz,*  the Court explained "those who have attained [public figure status] have

assumed roles of prominence in the affairs of society. Some occupy positions of such persuasive

power and influence that they are deemed public figures ***for all purposes***. More commonly, those

classed as public figures have thrust themselves to the forefront of particular controversies in

order to influence the resolution of the issues involved." *Id*. (emphasis added). In either event,

they invite attention and comment. *Id*. All purpose public figures have extremely powerful

access to communication channels to ***effectively*** defend their reputations. Private persons have

very little. *Id*. Public figures can be said to have "voluntarily exposed themselves to increased

risk of injury from defamatory falsehoods. No such assumption is justified with respect to private individuals." *Id.*

The California Supreme Court, for example, has held that a single interview with the "Bakersfield television station," as compared with defamation in a newspaper with a circulation of 2.5 million, is ineffective and contributes to finding an individual to be a "private person." *Khawar v. Globe Internat.*, 19 Cal. 4th 254, 965 P.2d 696, 79 Cal. Rptr. 2d 178, 1998 Cal. LEXIS 6880, 98 Cal. (Cal. 1998). Similarly, one who comments about defamatory statements in a bid to diffuse them or defend one's reputation, does not make the individual a voluntary public figure. *Id.*; see also *Cockram v. Genesco, Inc.*, 680 F.3d 1046 (8th Cir. Mo. 2012).

However, the scope of the risk of injury is **commensurate** with the type and kind of "voluntary exposure" as well as the **particular** topical area. So, a person can be a limited public figure for some topics and not for others. *Gertz*; *Readers Digest Assn. v. Superior Court* (1984) 37 C.3d 244, 254-56. For example, professional and collegiate sports coaches are limited public figures *as to their job performance in such context*, as such individuals voluntarily enter a career in sports. *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130. An expert in, and high profile, outspoken advocate of plastic surgery was found to be a limited public figure as to plastic surgery, such that statements alleging that his surgical techniques resulted in disfigurement were entitled to constitutional protection. *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 53 Cal. Rptr. 3d 752, 2007 Cal. App. LEXIS 107 (Cal. App. 3d Dist. 2007)("A person becomes a limited public figure by injecting himself into the public debate about a topic that concerns a substantial number of people. Once he places himself in the spotlight on a topic of public interest, **his private words and conduct relating to that topic become fair game**")(emphasis added).

The elements that must be present in order to characterize a plaintiff as a limited

purpose public figure (as opposed to a private figure) are: (1) there must be a pre-existing public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants; (2) the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of the public issue; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Gilbert v. Sykes*, 147 Cal.App.4th 13, 24, 53 Cal. Rptr. 3d 752 (2007); *Roe v. Doe*, 2009 U.S. Dist. LEXIS 59440, California Northern District Court (June 30, 2009); *Khawar v. Globe Internat.*, 19 Cal. 4th 254, 965 P.2d 696, 79 Cal. Rptr. 2d 178, 1998 Cal. LEXIS 6880, 98 Cal. (Cal. 1998); *Wolston v. Readers Digest Assn.* 443 U.S. 157 (1979) (voluntary act).

Furthermore, the US Supreme Court has described a defamation *equitable estoppel* rule. "[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111 (1979); *Khawar v. Globe Internat.*, 19 Cal. 4th 254, 965 P.2d 696, 79 Cal. Rptr. 2d 178, 1998 Cal. LEXIS 6880, 98 Cal. (Cal. 1998); *Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711, 771 P.2d 406, 257 Cal. Rptr. 708 (Cal. 1989). Thus, a private figure who attempts to defend himself in public after the controversy has erupted, cannot be said to have voluntarily injected himself into the public controversy. *Khawar v. Globe Internat.*, 19 Cal. 4th 254, 268; accord *Gallagher v. Connell*, 123 Cal. App. 4th 1260, 1273-74 (2004). And California recognizes no neutral reporting privilege as to private figures. *Khawar*, at 271.

In the present case, Johnson may well be a limited public figure as to Defendants' defamatory writings regarding his career as a journalist.

**C.    Johnson Is A Private Figure As To Statements Made Regarding Bestiality And Defecation**

In the present case, Defendants have conspired with anonymous third parties to publish a tidal wave of defamatory writings for the clear purpose of maligning Johnson and Got News. Through Defendants' own acts, at least as to the issues of defecation and bestiality, they have single-handedly created the controversy, and now attempt to defend themselves by suggesting that Johnson created the controversy - as if they were only the messenger of the controversy, rather than its source.[1]

In short, there was no controversy until Defendants created it. Gawker has a history of smearing individuals and groups, for profit. Gawker published between December 9 and December 15, 2014, Gawker published four articles vigorously juxtaposing Johnson and Got News with fraud and repulsive topics. As of December 9, Defendants had published three articles on Johnson (i.e., three articles in one day). That they spent such an enormous amount of time writing about Johnson in these ways is itself independently indicative of a serious hatred. That Johnson chose to attempt to defend himself cannot be used against him a device to transform him into a public figure. *Hutchinson v. Proxmire*, 443 U.S. 111 (1979). At no point was Johnson ever a public figure for the topical areas of bestiality or public defecation. At no point was it ever a public concern. As a result, Johnson is for those topic areas only a private figure. And he need only clear a negligence standard hurdle. Though, he has pled facts supporting counts (relating to the bestiality and public defecation defamation) to a level of actual malice.

### D.     Defendants Cannot Avail Themselves Of Any Privilege

---

[1] By way of comparison: writer/Journalist Hunter Thompson famously wrote an article for Rolling Stone during the 1972 Presidential election campaign, which claimed to report on rumors in Milwaukee that Presidential Candidate Edmund Muskie was being treated with a bizarre hallucinogenic drug, administered by a mysterious Brazilian doctor. After publication, rumor began circulating around the U.S., and causing public relations problems for Muskie. Later, Thompson admitted in a TV interview: "People really believed he was eating Ibogaine. I never said he was. I said there was a rumor in Milwaukee that he was. Which was true, and *I started the rumor* in Milwaukee … I'm a very accurate journalist." J.R. Jones, "The Real Hunter S. Thompson," Chicago Reader, July 3, 2008, http://www.chicagoreader.com/chicago/the-real-hunter-s-thompson/Content?oid=1109251 last accessed Oct 16, 2015.

### 1.     The defamatory statements are not opinions.

Defendants have purposefully kept their motion to dismiss vague. It isn't precisely clear what privileges they are asserting other than opinion. However, none of the statements are opinion. "[T]here is no constitutional value in false statements of fact." Rest.2d, Torts, Section 566 Comment c. "If a speaker says, 'In my opinion, John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, of if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, "Jones is a liar." *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 19 (1990); *Bentley Reserve LP v. Papaliolios*, 218 Cal.App.4th 418, 427 (2013). "Thus  a false statement of fact, whether expressly stated or implied from an expression of opinion, is actionable. *Milkovich*, 497 U.S. at 19. The key is not parsing whether a published statement is fact or opinion, but 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' *Franklin v. Dynamic Details, Inc*. (2004) 116 Cal.App.4th 375, 385. "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications … ." *Milkovich v. Lorain Journal Co*., 497 U.S. at 18–19; see *Ringler Associates Inc. v. Maryland Casualty Co*. (2000) 80 Cal.App.4th 1165, 1181; *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 903 (2004)(also noting that omitting critical facts can signify lack of opinion privilege).

In the present case, Trotter's statements about Johnson's reporting are provably false. The issue is whether the statement was provably false in a court of law, not whether the Defendants knew or could have known it was false when it was made. *Weller v. American Broadcasting Cos.*, 232 C.A.3d 991, 1006 (1991). Thus, when Trotter said "The list of Johnson stories that have been proven wrong is long, but his greatest hits include . . .[e]rroneously reporting that former Newark mayor Cory Booker didn't actually reside in Newark." *See* Defendants' Ex. 1. The statement is provably true or false, regardless of whether or not Trotter knew or could have known. The problem is, Johnson's story has not been proven wrong, and it is not wrong. *Id.* Further, although the source[2] that Trotter cites to support his statement implies that the allegation (i.e., that Senator Cory Booker did not live in Newark), the article does not prove that Johnson's article was wrong. Because Trotter's assessment of the article is also wrong, this also indicates that the statement is not opinion. *Milkovich v. Lorain Journal Co.*, 497 U.S. at 18–19.

Trotter also states that Johnson "complete[ly] fabricat[ed]" an article about Senator Robert Menendez. *See* Def. Ex. 1. Here again, Trotter cites to another news report as evidence of the veracity of his statement. *Id.* And yet, here again, the article cited does not come to a conclusion as to whether or not Johnson's reporting is false.[3] *Id.*

In both of these two instances, the statements were not portrayed in the article as mere opinions. No, they were stated as objective facts. They were provably false. Trotter either knew this or recklessly disregarded the truth.

---

[2] Trotter cited an article as evidence via hyperlinking from his own text to the URL for the cited news article.
[3] Plaintiffs note that the Department of Justice made an announcement in 2015 which corroborated Johnson's report. Chuck Ross, "*DOJ: Underage Prostitution Allegations Against Robert Menendez Backed By 'Corroborating Evidence*." August 24, 2015. http://dailycaller.com/2015/08/24/doj-underage-prostitution-allegations-against-robert-menendez-backed-by-corroborating-evidence/ last accessed Oct. 22, 2015.

Similarly, when Howard stated in the discussions section of his initiated December 9, 2014 article, "Tell you what. There is some good-ass kinja to be had re: Chuck shitting on the floor one time over at Gawker," although Howard is expressing an opinion as to his preference for the story, he in fact implies that Johnson publicly defecated at some point. *See* Def. Ex. 17. Further, his hyperlink in that quote links to a discussion post/comment by unpaid content creator Cmcalumna, wherein she had published her own defamatory statements. Cmcalumna's statement is defamatory because it implies that she has extrinsic facts not mentioned which further establish her claim. *Id.* Thus, she is not entitled to any privilege or opinion defense, either. Because her statement is unprivileged and false, this further erodes any argument in favor of Howard's statement being opinion.

### 2.    The defamatory statements are not hyperbole or satire.

In *Weller v. American Broadcasting Cos*., 232 C.A.3d 991, 1006 (1991), a dealer in silver antiques was held to have been defamed by a local TV station, which through innuendo and crafty usage of pseudo-journalistic devices, implied that the dealer had defrauded a museum. *Id*. Although the defendant had repeatedly qualified its broadcasts by stating that *it was merely posing the question* and that there were conflicting stories, the broadcasts could nevertheless have been understood as implying defamatory facts, as alleged by the plaintiff. *Id*. at 1003. Hence it was proper to allow the jury to decide in what manner the broadcasts were ultimately understood. *Id*. However, unlike hyperbole or satire, the publication of implied defamatory statements as part of an apparently objective and neutral investigation is almost certain to be understood as factual. Id. at 1004 ("We **reject** the notion that merely **couching** an assertion of a defamatory fact in cautionary language such as 'apparently' or 'some sources say' or even

14

putting it in the form of a question necessarily defuses the impression that the speaker is communicating an actual fact") (emphasis added).

Defendants have valiantly attempted to describe Trotter's treatment of the alleged public defecation and bestiality as mere satire, and all in good fun. A basic reading of the article demonstrates that this case is highly analogous in structure to Weller.

Defendants repeatedly sought comment from Plaintiffs to confirm or deny the allegations. Defendants contacted various persons purporting to be from Johnson's past. *See* Def. Ex. 22. Defendants contacted the San Bernardino Sheriff's Department, prosecutor and juvenile division in order to determine if Johnson had been charged with bestiality as a minor. *Id.* Defendants scoured through public records and newspaper clippings. *Id.* Defendants actively sought out other tipsters via the discussion/comments section of various articles written by Trotter and Howard, and followed up with various anonymous commenters (in some instances through publicly posted discussions/comments, and in some instances through private communication channels). *Id.* Importantly, neither Trotter nor Howard ever communicated that this was some "onion-esque" farce. *Id.* No, Defendants actually did some legwork and documented their findings publicly. *Id.*

Further, similar to *Weller*, Trotter attempted to couch his assertions in innuendo and innocent investigation of a rumor and entitling his article in the form of a question. ("Which of These Disgusting Chuck Johnson Rumors Are True?"). Also, despite listing out trains of evidence in each section of the article, at the end of such evidence in each section he would abruptly end his analysis and give the verdict: "There is no evidence …" Being an abrupt non-sequitur, the statement would ring hollow, further lending credence to the possibility that the

15

allegations were more likely true than false. The verdict" appeared as if to say to the audience, wink wink, nudge nudge, there's no evidence. A signal to the audience of just the opposite.

### 3.   The defamatory statements were not neutrally reported.

California has not adopted the neutral report test. However, a notable federal court opinion has suggested it is generally available to defamation defendants. Assuming it does, it only applies to situations wherein a defendant makes serious charges against a public figure, and in an accurate and disinterested way. *Edwards v. Nat'l Audubon Soc.*, 556 F.2d 113, 120 (2d Cir. 1977); *Barry v. Time, Inc.*, 584 F. Supp. 1110, 1123 (N.D. Cal. 1984). Critically, however, "a publisher who in fact espouses or concurs in the charges made by others, or who deliberately distorts these statements to launch a personal attack of his own on a public figure, cannot rely on a privilege of neutral reportage. In such instances he assumes responsibility for the underlying accusations. *Edwards v. Nat'l Audubon Soc.*, 556 F.2d at 120.

In the present matter it is clear by Defendants actions that they held a vendetta against Plaintiffs and were "reporting" as part of a concerted campaign not to fairly report matters of public interest, but to concoct and elicit defamatory content as a means to harm Plaintiffs.

### E. Defendants Cannot Avail Themselves of CDA 230 Protections.

As more fully stated in Plaintiffs' Response to Defendants Motion to Dismiss, p. 15-19, Defendants cannot make use of Communications Decency Act Section 230.

### F. False Light and Injurious Falsehood Succeed For the Same Reasons Plaintiffs' Defamation Claims Succeed.

Plaintiffs False Light and Injurious Falsehood claims for similar reasons as its

Defamation claims.

### Conclusion

For the foregoing reasons, Plaintiffs request that the Court deny Defendants' Motion to

Strike or Dismiss Pursuant to the California Anti-SLAPP Law. Alternatively, should the Court

find in favor of Defendants, Plaintiffs pray that this stay its determination as to Defendants' Anti-

SLAPP motion pending discovery, and any other relief this Court deems just and proper.

**Respectfully submitted,**

**THE BURNS LAW FIRM, LLC**

 /s/ John C. Burns
John C. Burns #66462MO
1717 Park Avenue
St. Louis, MO 63104
Phone: (314) 339-8388
Fax:    (314) 932-2171
john@burns-law-firm.com
*Attorney for Plaintiffs*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served,
via the Court's electronic notification system, on October 22, 2015, upon all parties of record.

 /s/ John C. Burns