IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
(Eastern Division)

| | |
|---|---|
| CHARLES C. JOHNSON, *et. al* | : |
| | : Case No. 4:15-cv-01137 |
| Plaintiffs, | : |
| v. | : |
| GAWKER MEDIA, LLC, *et. al,* | : |
| | : |
| Defendants. | : |
| | : |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
<u>MOTION TO DISMISS THE COMPLAINT</u>**

**I.  PLAINTIFFS HAVE FAILED TO ESTABLISH PERSONAL JURISDICTION**

This Court recently summarized Plaintiffs' burden with respect personal jurisdiction:

> If jurisdiction has been controverted, the plaintiff has the burden of proving facts supporting personal jurisdiction . . . .  The plaintiff's prima facie showing must be tested, not by the pleading alone, but by the affidavits and exhibits presented with the motions and opposition thereto.

*Barron v. Pfizer, Inc.*, 2015 WL 5829867, at *1 (E.D. Mo. Oct. 6, 2015) (citations and internal quotations omitted).  Plaintiffs, however, provide none of the above.  Instead, they make a laundry-list of factual assertions in their Memorandum, which are not evidence.  They also cite a few of the exhibits attached to their proposed Amended Complaint, which have no value because that pleading has not been accepted.  And even if considered, the exhibits cited (specifically Exs. 1-9, 41) have little to do with personal jurisdiction.  But even if Plaintiffs' unsupported assertions were treated as fact, it would make no difference and this case should be dismissed.

<u>Specific Jurisdiction</u>.   First, Plaintiffs never explain how Defendants could be subject to jurisdiction under the long-arm statute.  They do not identify "the commission of a tortious act within this state," nor do they demonstrate how their "cause of action aris[es] from . . . the

1

transaction of any business within this state." Mo. Rev. Stat. § 506.500.1(1), (3).  Plaintiffs argue that Gawker advertises in Missouri, but their claims do not arise out of any advertising. *Henriquez v. El Pais Q'Hubocali.com*, 500 Fed. App'x 824, 828 (11th Cir. 2012) (generic website ads are insufficient to satisfy "transacting business" prong of Georgia long-arm statute because defamation claim did not arise out of ads).  Moreover, ads in connection with these articles were placed by Google through its nationwide AdSense program, a third party ad service used by thousands of websites.  Ex. 1 –Decl. of Ryan Brown ¶ 4.  Multiple courts have held that contracting with AdSense is not purposefully directing activity towards any particular state.[1]

Turning to the due process inquiry, Plaintiffs offer a few arguments that actually address specific jurisdiction.  First, they point to the *Zippo* 'sliding scale' model, and declare that Gawker's websites are "unequivocally on the 'interactive' side of the *Zippo* spectrum," pointing to a user's ability to post information and comments on them.  Opp. at 1-2.  Plaintiffs misunderstand *Zippo*.  The Eighth Circuit has made clear that such comment and posting functions are not the type of interactivity that confers jurisdiction.  *Johnson*, 614 F.3d at 796 (capability to "post[] . . . information on a website" is not an interactive function).

Rather, "interactivity" relates principally to the "commercial nature of the exchange of information that occurs on the Web site." *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997).  In *Zippo*, jurisdiction was found because the website sold 3,000 paid subscriptions to forum state residents to enable them to fully use the site.  Gawker has no such commercial interactions with readers.  Moreover, interactivity is only part of the test, which

---

[1] *See Henriquez*, 500 Fed. App'x at 829 ("[t]he fact that a particular website displays an advertisement that is viewable in Georgia or shows a company that does business in Georgia does not, by itself, mean that the website owner had any contact with Georgia"); *Sterling Currency Grp. LLC v. Maurer*, 2013 WL 4011063 at *5 (N.D. Ga., Aug. 5, 2013) (same for Google's Adsense service); *Music Makers Holdings LLC v. Sarro*, 2010 WL 2807805, at *8 n. 12-13 (D. Md., July 15, 2010) (allegation that website participates in Adsense cannot establish specific jurisdiction because it "in no way demonstrates that Defendant directed electronic activity into Maryland, with the intent of engaging in business in the State"); *Gary Null & Assoc. v. Phillips*, 906 N.Y.S.2d 449, 453-454 (N.Y. Co. Sup. 2010) (participation in Adsense is not "purposefully direct[ing]"activity into New York).

2

also asks whether the cause of action arises out of forum-related interactions. *Id.* at 1127; *see also Johnson*, 614 F.3d at 796. Here, Plaintiffs point to no interactions by Defendants with Missourians that gave rise to their claims.

The same error underlies Plaintiffs' characterization of *Keeton v. Hustler Magazine, Inc.* Opp. at 5-6 (citing 465 U.S. 770, 771 (1984)). *Keeton* was much like *Zippo*; jurisdiction was found because the defendant magazine had shipped its publication to 15,000 paid subscribers in New Hampshire. Gawker has no such commercial relationship with Missourians. Nor did it "circulate" these articles to Missouri or "enter our homes," Opp. at 5-6, merely by maintaining a website that anyone in the world may view. The critical distinction between websites that are merely accessible anywhere, and publications that directly sell and ship goods to state residents, has been recognized by several Circuits holding that no jurisdiction existed over similar news websites. *See* Dkt. 19 at 6.

Plaintiffs do not address or explain any of that authority. Instead, they cite *Baldwin v. Fischer-Smith*, 315 S.W.3d 389, 392 (Mo. App. 2010), but that case only points to the absence of a jurisdictional nexus here because it involved defamatory statements about, and specifically targeted at, a Missouri resident. In fact, it was precisely that nexus that the Eighth Circuit found lacking in *Steinbuch v. Cutler*, 518 F.3d 580 (8th Cir. 2008), and the same is true here.

General Jurisdiction.   Most of the Opposition is aimed at making a list of unsupported assertions about "the quality and quantity of Defendants contacts in Missouri." Opp. at 3. Examples include the supposed number of Missourians who generally read Gawker websites, its social media pages, or follow tweets by its journalists; and Gawker coverage of the Cardinals. Plaintiffs assert that this demonstrates that Gawker "conduct[s] business within the State of Missouri regularly . . . ." *Id.* at 7. However, those are the kinds of facts that courts considered

3

for purposes of addressing general jurisdiction prior to the *Goodyear* and *Daimler* cases.  Dkt. 19 at 6-7.  Likewise, all of the portions of *Steinbuch* that Plaintiffs discuss concern its pre-*Daimler* analysis of general jurisdiction.  Opp. at 3.  As this Court recently held, "[m]erely establishing that a corporation regularly conducts business in a forum is not sufficient to confer general jurisdiction."  *Barron*, 2015 WL 5829867, at *2.  Rather, "[a] forum's exercise of general jurisdiction over a corporation is limited to its formal place of incorporation and principal place of business except in an 'exceptional case' . . . and this is not an exceptional case."  *Id.*  Defendants' Rule 12(b)(2) motion should be granted.[2]

## II.      ALTERNATIVELY, THE CASE SHOULD BE TRANSFERRED

In the event that this this Court nonetheless concludes that it may exercise jurisdiction, Defendants respectfully request the Court transfer this case to the Southern District of New York or the Eastern District of California.  Plaintiffs have not opposed the transfer motion and therefore have forfeited opposition to it.  *Roberds v. AT & T Operations, Inc.*, 2012 WL 4435116, at *10 (E.D. Mo. Sept. 26, 2012) (Shaw, J.).  And courts have regularly exercised discretion to transfer cases where a plaintiff fails to oppose such a motion.  *Beckham v. Nat'l R.R. Passenger Corp.*, 496 F. Supp. 2d 57, 59 (D.D.C. 2007); *LeMaster v. Purdue Pharma Co.*, 2004 WL 1398213, at *1 (E.D. Ky. June 18, 2004).

## III.     THE COMPLAINT FAILS TO STATE A CLAIM

### A.      Plaintiffs Are Public Figures Who Fail to Plausibly Allege Actual Malice

1.     <u>Plaintiffs Are Limited Purpose Public Figures</u>.  Plaintiffs concede they are public figures for purposes of some of the allegedly defamatory statements, *i.e.*, those about the

---

[2] Plaintiffs do not meaningfully attempt to show how this Court could exercise jurisdiction over defendants Trotter or Howard.  Plaintiffs' arguments about Gawker cannot be attributed to those individuals.  *Calder v. Jones*, 465 U.S. 783, 790 (1984) (a journalist's "contacts with [the forum state] are not to be judged according to their employer's activities there").  The Rule 12(b)(2) motion with respect to them should be granted for this reason alone.

4

accuracy of their journalism, but maintain that Johnson is a private figure for purposes of other statements in the same articles, *i.e.*, statements discussing rumors about his character.  Opp. at 9-10.  Plaintiffs may not slice the salami so thinly, for several reasons.

First, Plaintiffs cite no authority, and Defendants are aware of none, supporting the proposition that a plaintiff may be both a public and private figure for purposes of the same article.  That scenario makes little sense and would be impossibly confusing—for example, if a case went to trial a jury would have to be instructed about and apply two conflicting fault standards within the same article, or even the same sentence.  But even if it could be possible to sub-divide statements in that manner, it would make no difference here.

Plaintiffs' argument reduces the concept of a "public controversy" to a tautology—*i.e.*, they contend there must be a pre-existing public controversy over the *precise words* published by Defendants.  That is not the test, as the very authority they cite emphasizes.  Rather, the test addresses whether (1) there is "a public controversy *giving rise to* the defamatory speech" (2) and "the nature and extent" of the plaintiff's participation in that controversy.  *Lundell Mfg. Co. v. ABC*, 98 F.3d 351, 362-63 (8th Cir. 1996) (emphasis added).

For example, in *Gilbert v. Sykes*, 147 Cal. App. 4th 13 (3d Dist. 2007), Opp. at 9, the court rejected exactly the argument Plaintiffs make here.  In *Gilbert*, a patient of the defendant plastic surgeon posted statements claiming the surgeon committed malpractice.  The surgeon argued "there was no preexisting public 'controversy' *regarding the procedures performed by Dr. Sykes on Ms. Gilbert*," which were the specific statements at issue.  *Id.* at 25.  The court emphatically rejected that contention as hopelessly tautological:

> This claim is at war with the concept of a limited purpose public figure . . . Once [the plaintiff] places himself in the spotlight *on a topic* of public interest, his private words and conduct *relating to that topic* become fair game.  Sykes would turn this formulation on its head.  He would require that the plaintiff generate a

5

>   broad public controversy through private words or conduct before he could be deemed a public figure, an atrophic definition that would virtually eliminate all vortex public figure candidates . . . . That is not the law. Indeed, defamation decisions finding the complainants to be vortex public figures have typically involved persons who claimed they were defamed for private conduct *after* they injected themselves into matters of general public discussion or controversy.

*Id.* (emphasis added). If the law were otherwise, journalists could not, for example, freely expose a new scandal within a political administration long notorious for corruption, because there would never be a pre-existing controversy over the specific new act of malfeasance exposed.

In this case, the public controversy over Johnson was not limited to the accuracy of his journalism. Rather, it focused more broadly on Johnson's character; specifically, the fact that his signature brand of "GotNews" journalism was to personally attack his news subjects, especially with respect to their sexual and other personal behavior. *See* Dkt. 18-6, 18-16, 18-24. That is why Johnson is banned from Twitter; why the *New York Times* called him a "less edifying creation" of the internet; why *U.S. News* called him "a bully and a troll"; and why *Politico* criticized his "scorched-earth mentality and exploitation of subjects' personal lives." *See* Dkt. 18-23; Dkt. 21-11, 21-12.

Moreover, Johnson revels in this "notoriety and success," and promises to "openly mock" his critics as "weaker people [who] dislike strong people." *See* Dkt. 18-17. Johnson thus invited criticism of and inquiry into his character by embracing a controversy over his brand of journalistic character assassination of others. Plaintiffs cannot now claim foul when the microscope is turned on him. In fact, Defendant Trotter's article made this point explicitly to explain why Gawker was examining rumors about Johnson's behavior: "Given Johnson's various struggles with accuracy *and his dogged pursuit of a Times reporter's teenage* [*sexual*] *misdemeanor*, we've examined three stories going around about the conservative media icon."

6

Dkt. 18-22 (emphasis added). Plaintiffs are limited purpose public figures with respect to all the statements within the articles at issue here.

Finally, even if the doctrine were as narrow as Plaintiffs claim—*i.e.*, there must be a public controversy specifically over Johnson's alleged defecation and fornication—it would make no difference. Plaintiffs acknowledge that Johnson addressed those rumors "preemptively," but they claim that he was only defending himself because Gawker first "reached out to him" to respond. Opp. at 9-11. He cites cases like *Hutchinson v. Proxmire*, 443 U.S. 111 (1979), which he contends create an "equitable estoppel" rule. Opp. at 9-11.

But that is not what happened here. As Howard's article explains, it was Johnson who first noticed that others were making comments about alleged defecation, and he raised them in an e-mail to Howard to pre-emptively deny the rumor. *See* Dkt. 18-17 ("Oh, and the comments about me shitting on the floor were made up."). It was thus Johnson who prompted Howard to notice that the rumor was circulating and look into it. *Id.* As for the bestiality rumor, it was Johnson who first publicized it by publicly tweeting about it, five days before Trotter ever wrote about it. *See* Dkt. 18-22 ("This is why Deadspin got the Cory Gardner story wrong.").

There is no principle holding that a plaintiff may choose to pro-actively self-publicize the existence of an allegedly defamatory accusation for the purpose of preemptively denying it, and then contend he has no role in creating the controversy when the media responds. Pre-emptive publicity may be a useful public relations strategy, but a plaintiff's choice of public relations tactics is not what the First Amendment exists to protect. Thus, under any construction of the doctrine, Plaintiffs are limited public figures.

    2. <u>Plaintiffs Have Not Plausibly Alleged Actual Malice</u>. Plaintiffs point to only three statements for which they contend they have alleged a plausible claim of actual

7

malice. Opp. at 10-11. Even for these statements Plaintiffs fundamentally misapprehend the actual malice standard, and thus they fail to plausibly allege malice for any of the Complaint's allegedly defamatory statements. First, they claim that the statement about Johnson's Cory Booker reporting alleges actual malice because the article it links to is not, in Plaintiffs' opinion, "explicit and unequivocal evidence" that Booker lives in Newark. *Id.* at 12. But that is irrelevant to the actual malice inquiry, which focuses solely on whether there is any plausible basis to allege that Trotter subjectively believed that Booker does *not* live in Newark. Dkt. 19 at 10. The Complaint alleges no plausible basis for that. To the contrary, the *BuzzFeed* article Trotter linked to points to volumes of "property records and documentation" that Booker does live in Newark; it notes that [t]here is no clear evidence to support claims Booker lives elsewhere"; and it even points out in an update that the *Daily Caller* newspaper that published Johnson's story seemed to be backing away from it. *See* Dkt. 18-7.

Next, Plaintiffs assert they have plausibly alleged malice with respect to Trotter's statement that accusations by Cuban prostitutes about Senator Bob Menendez "turned out to be a complete fabrication." They point to their proposed Amended Complaint, which alleges that in a court filing in August 2015 the Justice Department asserted that "these allegations have been corroborated and proven true." Opp. at 12. That is not a plausible characterization of the Government's position, which in fact asserted just the opposite.[3] In any event, what someone said eight months after Trotter published his article is as a matter of law irrelevant to actual malice, which focuses solely on what the defendant subjectively believed *at the time the*

---

[3] The DOJ filing conceded that although initially those allegations appeared to have some corroboration, after an extensive investigation, "those allegations have not resulted in any criminal charges," and they remain "unproven allegations"   *See* Ex. 2 - DOJ Opp. to Mot. to Dismiss, at 2, 4. The Government's point was that there was a bona fide basis to investigate those allegations, and the fact they were not proven does not taint what the Department contends is solid evidence of unrelated political corruption by Menendez that it discovered in the course of conducting its investigation.

*statements were published*. *Herbert v. Lando*, 781 F.2d 298, 305-06 (2d Cir.) ("It is self-evident that information acquired after the publication of defamatory material cannot be relevant to the publisher's state of mind of his alleged malice at the time of publication."), *cert. denied*, 476 U.S. 1182 (1986).

As to what Trotter did say about Menendez, Plaintiffs resort to twisting his words beyond recognition.  They contend that when Trotter wrote, "the story turned out to be a complete fabrication and may even have been planted by the Cuban government," he was accusing *Johnson* of fabricating the story.  That is absurd—Trotter states that *prostitutes* that were the story's sources admitted to fabricating their accusations against Menendez, and may have been planted by the Cuban government to make them.  Trotter plainly was not alleging that Johnson, whom he characterized as a radical conservative journalist, was an agent of Fidel Castro.

Finally, Plaintiffs assert that Howard did not believe his statement that "Johnson has been caught lying several times before," Opp. at 12, but do not purport to set forth any plausible facts to support that contention.  That bald allegation of actual malice is precisely what courts have repeatedly held to be insufficient under *Iqbal*.  *See* Dkt. 19 at 10.  Rather, Plaintiffs' argument is that Howard did not "neutrally" report his statement, and they quote extensively from *Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir. 1989).  Plaintiffs confuse *Price*'s discussion of the neutral reporting privilege, an entirely separate defense in libel law, with the element of actual malice.  *Id.*  With respect to malice, *Price* makes clear that the "focus must be on the defendant's attitude toward the truth of the statements," not his "attitude toward the plaintiff." *Id.* at 1433.

**B.     Section 230 of the CDA Bars All Claims Based on Reader Comments.**

The immunity provided by Section 230 is not complicated to apply here.  Section 230(c)(1) provides:  "No provider or user of an interactive computer service shall be treated as

the publisher or speaker of any information provided by another information content provider." Gawker is indisputably a "provider" of "an interactive computer service," and the third-party comments which Plaintiffs seek to treat Gawker as "the publisher of" were all "provided by another information content provider." Section 230 has been applied to immunize websites like Gawker's from comments provided by readers for almost two decades.[4] *See Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010). Nor do Plaintiffs point to a single case that held a news and commentary website liable for any information provided by a reader.

Instead, Plaintiffs largely rely on cases like *General Steel Domestic Sales, LLC v. Chumley*, 2015 WL 4911585 (D. Colo. Aug. 18, 2015), and *FTC v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009). Those are not cases about news or analogous websites that allow readers to post comments and supply information. Both were about corporate websites in which the content was written entirely by the corporation. Because there was no content supplied by "another information content provider," Section 230 immunity did not apply to those websites.

The relevant inquiry here is whether Gawker "materially contributed" to "the creation or development" of the third-party content provider's information. *Jones v. Dirty World Entm't Recordings, LLC*, 755 F.3d 398, 413 (6th Cir. 2014). Plaintiffs assert, without any supporting authority, that Defendants materially contributed to statements by "republishing them"; "interacting with anonymous content providers, and encouraging them to provide more information"; "setting up a system whereby people may anonymously contribute to the website";

---

[4] *See, e.g.*, *Nemet Chevrolet, Ltd. v. ConsumerAffairs.com, Inc.*, 591 F.3d 250, 256-58 (4th Cir. 2009) (consumer review website ; *Asia Economic Institute v. Xcentric Ventures LLC*, 2011 WL 2469822 (C.D. Cal. May 4, 2011) (comments on Ripoff report website); *DiMeo v. Max*, 248 F. App'x 280, 282 (3d Cir. 2007) (comments on celebrity reporting website); *Collins v. Purdue Univ.*, 703 F. Supp. 2d 862, 878 (N.D. Ind. 2010) (comments on newspaper's website); *Shiamili v. Real Estate Grp. of N.Y., Inc.*, 17 N.Y.3d 281 (2011) (comments on real estate news blog).

10

and "selectively quoting" from the third party posters. Opp. at 15-19.[5] All of those activities are *precisely* what Section 230 protects. As the principal case Plaintiffs cite explained:

> [T]aking actions necessary to display content created or developed by another does not constitute development of information for the purpose of § 230(f)(3). Inviting or encouraging third parties to post content does not constitute development. *Id.* When an operator of a website ratifies or adopts third party content, including through the posting of commentary by the website operator, the website operator does not develop the information. Further, choosing to publish or not to publish third party content does not constitute development.

*Gen. Steel Domestic Sales*, 2015 WL 4911585, at *6 (internal citations omitted). Thus, there is no requirement that a website publisher remain neutral as between various comments users may provide. *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir 2003) (Section 230 "necessarily precludes liability for exercising the usual prerogative of publishers to choose among proffered material and to edit the material published while retaining its basic form and message"); *Blumenthal v. Drudge*, 992 F. Supp. 44, 52 (D.D.C. 1998) ("Congress has made a different policy choice by providing immunity even where the interactive service provider has an active, even aggressive role in making available content prepared by others."). The legal regime Plaintiffs propose would subject every website's editorial judgments to micro-analysis by the courts, and thus fundamentally undermine Section 230's ability to "maintain the robust nature of Internet communication." *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).

Finally, Plaintiffs cite to *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008), another case not involving a news-style website. In *Roommates*, the Ninth Circuit held that a website that connected potential roommates was responsible for *requiring* that all users of its website provide information about their gender, sexual preference and other information that violates the Fair Housing Act. *Id.* at

---

[5] Plaintiffs also point to "drafting multiple articles and generating salacious headlines about the rumors," Opp. at 16, but Defendants have never contended that Section 230 immunizes them for their own statements, including the headlines they wrote, within the articles at issue.

11

1165.  The court specifically noted that the website "does much more than encourage or solicit; it *forces* users to answer certain questions and thereby provide information that other clients can use to discriminate unlawfully."  *Id.* at 1166 n.19 (emphasis added).

Plaintiffs try to analogize this case to *Roommates* by claiming that Gawker "set[s] up a system whereby people may anonymously contribute to the website to avoid liability for defamation."  Opp. at 16.  This argument fails for two reasons.  First, it is false as a factual matter.  It is certainly true that Gawker makes it possible for people to post their thoughts anonymously.  Many news websites—including Gotnews.com[6]—encourage anonymous contributions.  Journalists for centuries have cultivated anonymous sources, and indeed in the internet age the law has come to recognize a qualified First Amendment *privilege* for people to speak anonymously on the internet.  *See, e.g.*, *Sedersten v. Taylor*, 2009 WL 4802567, at *1-2 (W.D. Mo. Dec. 9, 2009) (noting that "First Amendment protection extends to speech via the Internet" and that "[t]he Internet is a particularly effective forum for the dissemination of anonymous speech" (marks and citations omitted)).  But none of the exhibits Plaintiffs attach to their proposed Amended Complaint suggest that Gawker's purpose for encouraging anonymous contributions is "to avoid liability for defamation."

Even if that were so, it would make no difference.  *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929, 933 (D. Ariz. 2008) (a website entitled Ripoff Report may

---

[6] The main webpage of Gotnews.com has a link "Submit a Tip to GotNews," which calls up a questionnaire in which one of the conditions a submitter may check is "Remain Anonymous."  *See* GotNews, http://gotnews.com/submit-tip-gotnews.  We note that the Court may take judicial notice of the newspaper articles, public records, and references to Plaintiff's website for purposes of a motion to dismiss.  Most of the newspaper articles related to the public figure and opinion analysis are "necessarily embraced by the complaint," *Enervations, Inc. v. Minnesota Mining and Mfg Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004), and thus courts regularly consider on motions to dismiss both the allegedly defamatory publication and any articles to which they link.  *See, e.g.*, *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015).  Moreover, newspaper articles, a plaintiff's website and public records are properly the subject of judicial notice if submitted for purposes of establishing the existence of a public controversy.  *Stahl v. U.S. Dep't of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003); *Von Saher v. Norton Simon Museum of Art of Pasadena*, 592 F.3d  954, 960 (9th Cir. 2009) ("Courts may take judicial notice of publications introduced to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." ) (citations omitted)).

12

attract defamatory content, but there was "no authority for the proposition that this makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site"). Rather, all that matters for purposes of Section 230 is that Gawker does "not require users to post illegal or actionable content as a condition of use." *Jones*, 755 F.3d at 416.

    **C.    None of the Statements Made By Defendants Are Actionable As a Matter of Law.**

        1.    <u>The Statements About Johnson's Accuracy Are Protected Opinion</u>.

Plaintiffs argue in their anti-SLAPP Opposition that Trotter's statement that Johnson "gets things wrong a lot," and the examples he provides, are not opinions because Plaintiffs contend Johnson only got some of those examples wrong and the linked-to articles do not prove otherwise.[7] Dkt. 51 at 12-13. Plaintiffs fail to grasp the key point, which is that whether they illustrate flawed reporting is a matter of opinion that readers are free to evaluate for themselves by reading the linked-to articles. As the Eighth Circuit has emphasized, a statement's *context* is critical in assessing whether a statement is fact or opinion. *Price*, 881 F.2d at 1433 ("We must therefore always ultimately focus on the context from which both the dispute and the statements arise, remaining sensitive to our republic's interest in robust debate . . . ."); *Janklow v. Newsweek*, 788 F.2d 1300, 1304 (8th Cir. 1986).

Thus, Plaintiffs cite extensively to *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1991), but the context of that dispute shows why Defendants' statements in this case are protected opinion. In *Milkovich* a newspaper columnist wrote that a high school football coach had lied in sworn testimony given at a disciplinary hearing, but provided nothing that explained to the

---

[7] Plaintiffs do not dispute that the first example Trotter provided of Johnson's reporting was in fact inaccurate (a *New York Times* reporter allegedly posing for *Playboy*), nor do they dispute they published the wrong picture of the "Jackie" involved in the *Rolling Stone* alleged fraternity rape story.

13

reader why he drew that conclusion.  Trotter provided his readers with explanation of his conclusion, as did Howard by linking to Trotter's column to make the same point.

Moreover, Plaintiffs do not address the case law most relevant here, such as *Moldea v. New York Times Co.*, 22 F.3d 310 (D.C. Cir. 1994), which applied *Milkovich* in the particular context of one journalist critiquing the work of another.  In this context, the appropriate inquiry is whether the critique is a "supportable interpretation" of examples of the plaintiff's work.  *Id*. at 311-13.  Nor do Plaintiffs address any of the internet-age cases which hold that providing hyperlinks is a sufficient disclosure of facts upon which the author's opinion is based.  Dkt. 19 at 12 (citing cases).  There can be no question that Trotter's assessment of the articles to which he links is a "supportable interpretation" of what they say.  Nor does Trotter in any way imply that he has knowledge of additional defamatory facts pertinent to those examples that he does not report.  *See Milkovich*, 497 U.S. at 19-20.

2. <u>The Reporting About Rumors Is Not Defamatory</u>.  Plaintiffs do not meaningfully dispute the common-sense proposition that reporting a rumor in order to debunk it is not reasonably capable of a defamatory meaning.  Instead, they baldly assert that when Defendants reported that "there is no evidence" that the defecation and bestiality rumors are true, they really meant ("wink, wink, nudge, nudge") they are true.  Dkt. 51 at 15-16.  They point to *Weller v. American Broad. Cos*., 232 Cal. App. 3d 991 (1st Dist. 1991), Dkt. 51 at 14-15, but the point of *Weller* was that the defendant television station (1) did not say there was no evidence to support the allegations at issue, and (2) repeatedly made statements suggesting they were likely true.  *See, e.g.*, *Weller*, 232 Cal. App. 3d at 1018 (Anchor: "Carol's back in the studio with us tonight with the latest on what appears to be a sweetheart deal between the antique dealers." Reporter:  Van, it does look that way.").  That is not the case here.

14

Rather, Plaintiffs' "when they said stop they really meant go" logic would render virtually any statement in the world actionable defamation. Notably, the Eighth Circuit has squarely rejected their argument. In *Price*, the Court considered "the reporting of rumors about the murder, together with the author's summation, "No one I have talked to makes the serious claim that David Price killed Anna Mae Aquash." 881 F.2d at 1443. It rejected the contention that such reporting could be capable of a defamatory meaning, explaining that:

> Whether or not Price killed Aquash is a question of fact. But obviously the author makes no such accusation. He exonerates Price of killing her . . . . We do not believe that Price can choose what meanings to attach to these statements where several are available.

*Id.* at 1444. The same point applies here.[8]

Finally, Plaintiffs provide no response to the wealth of authority holding that questions cannot be libelous unless they can reasonably be read as assertions of false facts. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993). Unlike the reports in *Weller*, Gawker's articles not only are presented in the form of questions, the only answer they suggest is that the rumors about which Johnson complains are not true. Furthermore, the tenor of the articles makes clear they are tongue-in-cheek efforts to turn the table on Johnson's own style of reporting, which relies on digging up rumors about people. That further negates any contention that they actually assert the rumors as defamatory statements of fact. *See* Dkt. 19 at 13. Finally, Plaintiffs do not dispute that their remaining claims rise or fall with the defamation ones.

## CONCLUSION

Defendants respectfully request that the Court grant their motion to dismiss.

---

[8] The same point also applies to Howard's statement that "There is some good-ass kinja to be had re: Chuck shitting on the floor one time over at Gawker." That statement does not "impl[y] that Johnson publicly defecated at some point" as Plaintiffs assert, Dkt. 51 at 14; to the contrary, Howard wrote he doubts that occurred. He simply humorously noted there are entertaining comments about this topic.

15

Dated:  November 12, 2015			Respectfully submitted,


                         **LEWIS, RICE & FINGERSH, L.C.**

By:     /s/ Joseph E. Martineau
    Joseph E. Martineau, #32397
    600 Washington, Suite 2500
    St. Louis, Missouri  63101
    jmartineau@lewisrice.com
    314/444-7729
    314/612-7729 (facsimile)

    Nathan Siegel*
    LEVINE SULLIVAN KOCH & SCHULZ, LLP
    1899 L St., NW, Suite 200
    Washington, DC 20036
    Tel:  (202) 508-1100
    Fax:  (202) 861-9888
    nsiegel@lskslaw.com
    *pro hac vice*

*Attorneys for Defendants*


## CERTIFICATE OF SERVICE

The undersigned certifies that on this 12th day of November, 2015, a copy of the above and foregoing document was filed with the Court and served upon counsel for Plaintiffs via the Court's electronic filing system, as follows:

    Jonathon Christian Burns
    **THE BURNS LAW FIRM**
    1717 Park Avenue
    St. Louis, Missouri  63104
    john@burns-firm.com

    *Attorneys for Plaintiffs*

                                    By:     /s/ Joseph E. Martineau